**Wilfred KEYES, individually and on behalf of Christi Keyes, a minor, et al., Plaintiffs,**

**v.**

**SCHOOL DISTRICT NUMBER ONE, DENVER, COLORADO, et al., Defendants.**

Civ. A. No. C–1499.

United States District Court
D. Colorado.

Aug. 14, 1969.

Vacated and Remanded Aug. 27, 1969.

Order Reinstated Aug. 29, 1969.

See 90 S.Ct. 12.

Barnes & Jensen, by Craig S. Barnes, Gerald L. Jensen, Holland & Hart, by Gordon G. Greiner, Lawrence W. Treece, Robert T. Connery, Denver, Colo., for plaintiffs.

Henry, Cockrell, Quinn & Creighton, by Richard C. Cockrell, Victor Quinn, Thomas E. Creighton, Benjamin L. Craig, Michael Jackson, Denver, Colo., for defendants, except John H. Amesse, James D. Voorhees, Jr., and Rachel B. Noel, as individuals.

SUPPLEMENTAL FINDINGS, CONCLUSIONS AND TEMPORARY INJUNCTION

WILLIAM E. DOYLE, District Judge.

This case is before the Court following remand issued by the United States Court of Appeals for the Tenth Circuit

on August 7, 1969. In its opinion the Court of Appeals (1) questioned the sufficiency in terms of specificity of our injunctive order, and (2) directed that this Court consider Title IV, § 407(a) of the 1964 Civil Rights Act, 42 U.S.C. § 2000c–6(a).

A hearing was held on August 7, 1969. The Court, having heard the arguments, does hereby issue a more specific injunctive order. The question of the applicability of the above mentioned statute will be considered in a supplemental opinion. Also, the following supplemental findings are added to the oral findings of fact given from the bench on July 23, 1969, and the formal findings of fact contained in this Court's opinion issued on the 31st day of July, 1969. The findings hereinafter set forth are directed to the schools which received particular attention at the trial. These findings undertake to describe the special circumstances surrounding these particular schools, and the conclusions which are to be drawn from these findings.

### FINDINGS OF FACT

*Barrett Elementary School* (Located at East 29th Avenue and Jackson Street.)

1. Barrett Elementary School was opened in 1960. At that time its student body was 89.6 percent Negro. Presently the racial composition of Barrett is virtually 100 percent minority students (93% Negro, 7% Hispano). Thus, from the time of its establishment until the present Barrett has always been a segregated school.

2. The average percentage of Negro teachers in elementary schools in School District No. 1 as of September 1968 was 8.5 percent. In Barrett school the percentage of Negro teachers is 52.6 percent. This concentration of Negro teachers in a "Negro" school has further contributed to the categorization of Barrett as a segregated school.

3. Between 1950 and 1960 the Negro population, which previously had been concentrated in an area known as "Five Points" began to expand to the east. By 1960 it had moved up to Colorado Boulevard, a natural dividing line. This trend of population was apparent long before the migration of the Negro population eastward to Colorado Boulevard was completed. With full knowledge of this population trend and the fact that Barrett would be a segregated school from the time of its establishment, the Board proceeded with and carried into effect the plans for the building of that school.

4. At the time that Barrett was built, the School Board created the eastern boundary of the Barrett district along Colorado Boulevard. Thus, the eastern boundary of Barrett school district was made coterminous with the eastern boundary of Negro population movement at that time. This insured the character of Barrett as a segregated school.

5. When Barrett was built, Stedman Elementary School, in a predominantly white area east of Colorado Boulevard a few blocks from the Barrett site, was operating at approximately 20 percent over capacity. Had the eastern boundary of the Barrett district been set to the east of Colorado Boulevard, it would have resulted in some integration of Barrett, while alleviating somewhat the overcrowded conditions at Stedman. By establishing Colorado Boulevard as the eastern boundary of the Barrett district, the Board declined to utilize Barrett to achieve these salutary effects. Furthermore, Barrett was built as a relatively small school (capacity 450) which further prevented its use to relieve overcrowded conditions in the neighboring "white" Stedman. Thus, Barrett was built and opened as a segregated school.

6. In light of the facts as they existed in 1960, there can be no doubt that the positive acts of the Board in establishing Barrett and defining its boundaries were the proximate cause of the segregated condition which has existed in that school since its creation, which condition exists at present.

7. The action by the Board with respect to the creation of Barrett school was taken with knowledge of the consequences, and these consequences were not merely possible, they were substantially certain. Under such conditions

we find that the Board acted purposefully to create and maintain segregation at Barrett.

8. The Board maintained the segregated condition which it had created at Barrett by failing to take any action to correct it between 1960 and 1969. On April 24, 1969, the Board passed Resolution 1531 (operative September 1969) which would have desegregated Barrett by altering school district boundaries. Prior to the passage of Resolution 1531, Barrett was 93 percent Negro and 7 percent Hispano. The racial composition in that school subsequent to implementation of 1531 would have been 73 percent Anglo, 24 percent Negro, 3 percent Hispano.

9. On June 9, 1969, the Board, by a 4 to 3 vote, rescinded Resolution 1531 and thereby reaffirmed its prior policy of maintaining and perpetuating segregation at Barrett. Although this was carried out in response to what was called a voter mandate in a school board election, there can be no doubt that the purpose and effect of the action was segregation.

*Stedman Elementary School* (This school is located at East 29th Avenue and Dexter Street, approximately 8 blocks east of Barrett Elementary School.)

1. Stedman Elementary School was in 1960 a predominantly "white" school, the student body being only 4 percent Negro. However, as a result of Negro population trends and rigid adherence to school boundaries by the Board, by 1962 Stedman was 50–65 percent Negro.

2. In 1962 and for several years prior thereto, Stedman had been overcrowded. Although Stedman could not be considered a segregated school at that time, it was clear by virtue of area population movement that it would become segregated in the near future if immediate steps were not taken to alleviate the overcrowding and stabilize the racial composition. Seven boundary changes were proposed in 1962, three of which would have relieved overcrowding at Stedman by placing the overflow in Smith, Hallett, and Park Hill, each of which was predominantly Anglo at that time. The Board rejected the three Stedman proposals, adopting the other four which pertained to areas with Negro populations of less than three percent. By refusing to pass the proposed boundary changes for Stedman, overcrowding was perpetuated and Negro students at that school were prevented from attending nearby "Anglo" schools.

3. By 1963 Stedman was only 18.6 percent Anglo and was still overcrowded. In 1964, the Board adopted several boundary changes, two of which had the immediate effect of aggravating the segregated situation at Stedman by transferring predominantly Anglo portions of the Stedman district to other "white" schools in the area. First, a predominantly "white" portion of the Stedman zone was detached to Hallett. Second, the Park Hill-Stedman optional zone was transferred to Park Hill. This area was approximately 96 percent Anglo, and represented that part of the Stedman district with the lowest Negro population. These changes did not significantly reduce overcrowding at Stedman. Rather, they tended to further segregate Stedman by removing the option open to many Anglo students to attend Stedman and preventing Negro students at that school from attending the predominantly Anglo schools in Park Hill.

4. Between May 1964 and May 1965, four mobile units were placed at Stedman to relieve the overcrowded conditions. This, like the previous actions of the Board with respect to school boundaries in the Stedman district, had the effect of preserving the Anglo character of certain Park Hill schools and the segregated status of Stedman.

5. As of 1968, Stedman was 94.6 percent Negro and 3.9 percent Anglo. On April 24, 1969, the School Board passed Resolution 1531 which was designed to alleviate the containment of Negro students in Stedman which had resulted from the Board's conscious efforts to preserve the Anglo character of other Park Hill schools. While 1531 would not have substantially reduced the *per-*

*centage* of Negro students at Stedman, it did provide that an additional 120 Negro children were to be transported from Stedman to predominantly Anglo schools (prior to this time 286 Stedman students were being bussed to Force, Schenck, and Denison schools). This would have provided an additional outlet for Negro children at Stedman, enabling them to attend a racially integrated school, and at the same time would have removed the need for the four mobile units. This was designed to relieve and mitigate the intense segregation condition at Stedman as well as to relieve overcrowding.

6. On June 9, 1969, the School Board repealed Resolution 1531. The natural and probable consequence of the Board's action was to continue the containment of Negro students at Stedman and to reassign Negro children who would have attended an integrated school under Resolution 1531 to the segregated Stedman.

7. The actions of the Board with respect to boundary changes, installation of mobile units and repeal of Resolution 1531 shows a continuous affirmative policy designed to isolate Negro children at Stedman and to thereby preserve the "white" character of other Park Hill schools.

*Park Hill and Philips Elementary Schools* (Park Hill is located at 5050 East 19th Avenue, which is approximately 8 blocks south and 6 blocks east of Barrett. Philips is located at 6550 East 21st Avenue, which is 7 blocks south and 25 blocks east of Barrett.)

1. In 1960 both Park Hill and Philips Elementary Schools were overwhelmingly Anglo in racial composition. Despite continued Negro population movement into these school districts, Park Hill and Philips presently continue to have a majority of Anglos in the student body. This characteristic of both schools is due at least in part to the efforts of the Board to prevent the use of Park Hill and especially Philips to relieve the overcrowding at Stedman.

2. By 1968 the racial composition of Park Hill was 71.0 percent Anglo, 23.2 percent Negro and 3.9 percent Hispano.

The racial composition of Philips was 55.3 percent Anglo, 36.6 percent Negro and 5.2 percent Hispano. The probable result of maintaining rigid school boundaries in these districts combined with the present trend of Negro population movement would be the transition of Philips and Park Hill into substantially segregated schools.

3. On April 24, 1969, the Board passed Resolution 1531 which would have stabilized the racial composition of these two schools (Park Hill would have been stabilized at 79 percent Anglo, 13 percent Negro, 8 percent Hispano; Philips would have been stabilized at 70 percent Anglo, 22 percent Negro, 8 percent Hispano), by a system of transporting some 70 students at Park Hill to Steele and Steck Elementary Schools and 80 students from Philips to Ashley and Palmer Elementary Schools. Also, 80 students would be transported to Philips from Palmer and Montclair Elementary Schools. Resolution 1531 recognized the interrelationship between Philips and Park Hill schools and Stedman, Barrett and Hallett. Thus, even though Philips and Park Hill were not segregated as of 1969, the Board felt that effective desegregation could take place at Barrett, Stedman and Hallett only if other Park Hill area schools were included in a total plan.

4. The School Board repealed Resolution 1531 on June 9, 1969. The effect of this action was to restore the original boundaries in the Park Hill and Philips districts, the probable result of which would be a gradual increase of Negro students into Park Hill and Philips schools ultimately approaching a segregated situation. Furthermore, by repeal of 1531 Park Hill and Philips would be reestablished as buffers against the influx of Negro children into other Anglo schools in the Park Hill area. Stedman, Barrett and Hallett would be returned to their status as overcrowded, segregated schools with no effective outlet provided into predominantly Anglo schools such as Ashley and Palmer.

5. In light of the natural and probable segregative consequences of remov-

ing the stabilizing effect of Resolution 1531 on Park Hill and Philips and re-establishing the original district boundaries, the Board must be regarded as having acted with a purpose of approving those consequences.

6. These boundary changes for Park Hill and Philips are necessary to the success of the entire plan called for in Resolution 1531.

*Hallett Elementary School* (Hallett is located at 2950 Jasmine Street, 20 blocks east of Barrett.)

1. The Negro enrollment at Hallett Elementary School has increased from approximately one percent in 1960 to 90 percent in 1968.

2. In 1962 several boundary changes in the Park Hill elementary school districts were proposed and all but three were adopted by the Board. One of the three boundary proposals considered but not adopted would have detached part of the Stedman district to Hallett. At that time Stedman was 50–65 percent Negro and was overcrowded, whereas Hallett was operating under capacity and was approximately 85–95 percent Anglo. The adoption of this boundary change would have relieved some overcrowding at Stedman while increasing Negro enrollment at Hallett. By refusing to adopt the change, Negro students were confined in an overcrowded, segregated school and were denied the opportunity of attending an integrated school.

3. One of the 1962 boundary changes which was adopted assigned the Hallett-Philips optional zone to Philips. This reassigned zone was predominantly Anglo and Philips was at this time virtually 100 percent Anglo. There was no problem of overcrowding at either Hallett or Philips. All that was accomplished was the moving of Anglo students from a school district which would gradually become predominantly Negro to one which has remained predominantly Anglo.

4. By 1964 Hallett was 68.5 percent Anglo. A boundary change in that year detached a predominantly Anglo area from the Stedman district to Hallett, an detached an 80 percent Anglo area from Hallett to Philips. This latter area constituted the section of highest Anglo concentration in the Hallett district. After the 1964 boundary changes, Hallett was only 41.5 percent Anglo. This decrease in Anglo enrollment was due in part to the transfer of the predominantly "white" portion of Hallett's attendance area to Philips.

5. In 1965 four mobile units were constructed at Hallett. Shortly thereafter the Board also approved the construction of additional classrooms. At this time Hallett was approximately 75 percent Negro. The effect of the mobile units and additional classrooms was to solidify segregation at Hallett increasing its capacity to absorb the additional influx of Negro population into the area.

6. Resolution 1531, adopted by the Board on April 24, 1969, provided that the Superintendent develop and institute plans to make Hallett a demonstration integrated school by use of voluntary transfer of pupils. The proposed plan would have transferred 500 Anglo students to Hallett while transporting 500 Hallett pupils to predominantly Anglo schools. This would have decreased the Negro concentration at Hallett from approximately 90 percent to about 40 percent.

7. Resolution 1533, passed by the Board after the rescission of Resolution 1531, also provides for a "voluntary exchange plan" for Hallett. Although this latter resolution does not refer to the purpose of integration, as did Resolution 1531, its intention seems to be substantially similar to that of 1531 with regard to the Hallett situation.

*Smiley Junior High School* (Smiley is located at 2540 Holly Street.)

1. In 1968 Smiley Junior High School was 23.6 percent Anglo, 71.6 percent Negro and 3.7 percent Hispano. The elementary school feeders for Smiley are Hallett (10.1 percent Anglo, 84.4 percent Negro, 3.7 percent Hispano); Park Hill (71 percent Anglo, 23.2 percent Negro, 3.9 percent Hispano); Smith (2.8 percent Anglo, 94.9 percent

Negro, 1.6 percent Hispano); Philips (55.3 percent Anglo, 36.6 percent Negro, 5.2 percent Hispano); Stedman (3.9 percent Anglo, 92.4 percent Negro, 2.9 percent Hispano); Ashley (85.8 percent Anglo, 6.4 percent Negro, 5.8 percent Hispano); and Harrington (5.0 percent Anglo, 77.7 percent Negro, 15.2 percent Hispano). Because of Negro population movement into this area, it is substantially certain that continuance of the boundaries as reestablished by repeal of Resolutions 1520 and 1524 will result in Smiley becoming almost completely Negro in the future.

2. Smiley has the second highest number of minority teachers of any junior high school in the city. There are 23 Negro and Hispano teachers at Smiley, while no other junior high school, with the exception of Cole, has more than six teachers from racial minority groups.

3. In light of the racial composition of the Smiley student body and faculty in 1968, the racial composition of the Smiley feeders, and Negro population movement into the area, we find that in 1968 Smiley was a segregated school.

4. In 1969 the School Board undertook to correct the segregated situation at Smiley by the adoption of Resolutions 1520 and 1524. These Resolutions were designed to desegregate Smiley by a substantial alteration of junior high school boundary lines. Had the Resolutions been implemented, the racial composition of Smiley would have been 72 percent Anglo, 23 percent Negro, and 5 percent Hispano.

5. On June 9, 1969, the Board repealed Resolutions 1520 and 1524. The effect of this repeal was to reestablish Smiley as a segregated school by affirmative Board action. At the time of the repeal, it was certain that such action would perpetuate the racial composition of Smiley at over 75 percent minority and that future Negro population movement would ultimately increase this percentage. Thus, the Board acted with full knowledge of exactly what the consequences of the repeal would be. We, therefore, find that the action of the Board in rescinding Resolutions 1520 and 1524 was wilful as to its effect on Smiley.

*East High School* (East is located at 1545 Detroit Street.)

1. Before passage of Resolution 1520, East High School was approximately 54 percent Anglo, 40 percent Negro and 7 percent Hispano. Resolution 1520 would have reduced the racial minority enrollment at East to 32 percent. Neither before nor after the passage of 1520 could East be considered a segregated school.

2. The boundary changes embodied in Resolutions 1520, 1524, and 1531 would have indirectly affected the racial composition of East through changes in East's feeder schools. Rescission of these Resolutions might, through the feeder system, result in a segregated situation at East in the future.

SUMMARY OF FINDINGS

All of the elementary schools discussed in the supplemental findings set forth above are located in the Park Hill area. There is a high degree of interrelationship among these schools, so that any action by the Board affecting the racial composition of one would almost certainly have an effect on the others. Furthermore, since all of these elementary schools operate as feeders for Smiley Junior High School (with the exception of Barrett), any factors affecting the racial composition of the elementary schools will also have a similar effect on Smiley. It is significant to note that Board actions between 1960 and 1969, such as the 1962 and 1964 boundary changes, dealt with the entire Park Hill area and had some effect on each school in that section of the city. Thus, the Board itself has continuously recognized the interrelationship of schools in northeast Denver.

Between 1960 and 1969 the Board's policies with respect to these northeast Denver schools show an undeviating purpose to isolate Negro students first in Barrett, and later in Stedman and Hallett while preserving the Anglo character of schools such as Philips and Park Hill. The ultimate effect of the Board's ac-

tions and policies in the face of a steady influx of Negro families into the area was to create and maintain segregated situations at Barrett, Stedman, and Hallett which ultimately led to a substantially segregated situation at Smiley.

In adopting Resolutions 1520, 1524 and 1531, the Board recognized its constitutional responsibility to desegregate schools in northeast Denver. These Resolutions were adopted by a five to two majority following the recommendations of both the Special Study Committee created in 1962 and a second committee created in 1966, and recommendations contained in the report of Dr. Gilberts and the Board staff submitted in October 1968. The reports of the 1962 and 1966 committees made clear that the continued rigid adherence to the established school boundary lines had led to segregation in several Park Hill schools. These Resolutions constituted legitimate legislative action designed to remove the segregation in Park Hill schools by means which were both moderate and reasonable in light of existing conditions.

Resolutions 1520, 1524, and 1531 were designed to relieve segregation in Barrett, Stedman, Hallett and Smiley by altering school district boundaries. Among other things these Resolutions would have transferred heavily concentrated Negro portions of the Barrett, Park Hill, Philips and Smiley districts to predominantly Anglo schools, while transporting a substantial number of Anglo students to the segregated schools. Segregation at Hallett and Stedman was to be relieved by a vigorous policy of voluntary bussing. Although at the time these Resolutions were passed Philips and Park Hill schools were not segregated, the Board recognized that they were key elements in dealing with the interrelated situation in northeast Denver and that any overall scheme for desegregating Barrett, Hallett, Stedman and Smiley would necessarily require affirmative action with respect to Park Hill and Philips.

On June 9, 1969, the Board rescinded Resolutions 1520, 1524 and 1531. This action was taken with little study and was not justified in terms of educational opportunity, educational quality or other legitimate factors. The only stated purpose for the rescission was that of keeping faith with the will of the majority of the electorate.

The effect of the rescission was to restore and perpetuate the status quo as it existed in northeast Denver prior to the passage of Resolutions 1520, 1524 and 1531. This status quo was one of segregation at Barrett, Hallett, Stedman and Smiley. As a replacement for proposals embodied in Resolutions 1520, 1524, and 1531, the Board adopted Resolution 1533 which in essence provides for desegregation on a voluntary basis, a program which has been unsuccessful and which furnishes little promise.

## CONCLUSIONS OF LAW

1. The policies and actions of the Board prior to the adoption of Resolutions 1520, 1524 and 1531, which conduct is specifically described in the foregoing findings, constitute de jure segregation.

2. The adoption of Resolutions 1520, 1524 and 1531 was a bona fide attempt of the Board to recognize the constitutional rights of the persons affected by the prior segregation.

3. The rescission of Resolutions 1520, 1524 and 1531 was a legislative act which had for its purpose restoration of the old status quo and was designed to perpetuate segregation in the affected area. This act in and of itself was an act of de jure segregation. It was unconstitutional and void.

4. Section 407(a) of the Civil Rights Act of 1964, Title 42 U.S.C. § 2000c–6(a) has been fully considered. It does not apply to a private civil rights action asserting violation of the Constitution. A supplemental opinion will expound the reasons in support of this conclusion.

## PRELIMINARY INJUNCTION

This matter having come on for hearing upon remand by the Court of Ap-

peals for the Tenth Circuit on the motion of plaintiffs for a preliminary injunction, and the Court having heard the testimony of the witnesses, having reviewed and considered the exhibits in evidence herein, and having heard the statements of counsel:

The Court finds that:

1. The Court has jurisdiction over the subject matter of this action under 28 U.S.C. Sections 1343(3) and 1343(4). This is a civil action authorized by law and arising under Title 42 U.S.C. Section 1983 and the Fourteenth Amendment of the Constitution of the United States;

2. The Court has jurisdiction over the parties herein;

3. Plaintiffs and the classes which they represent have no adequate remedy at law;

4. Unless this preliminary injunction issues, plaintiffs and the classes which they represent will suffer irreparable injury;

5. Plaintiffs and their classes have demonstrated a reasonable probability that they will ultimately prevail upon a full trial of the merits herein.

Based upon the foregoing findings together with those contained in the opinion heretofore rendered it is

Ordered, adjudged and decreed that the motion for a temporary injunction should be and the same is hereby granted to the following extent:

The defendants, their agents and servants are enjoined and restrained, during the pendency of this action, from any conduct which would modify the status quo as it existed prior to June 9, 1969, in respect to acquisition of equipment, destruction or relocation of documents, writings and memoranda, and are further enjoined and restrained from implementing Resolution 1533, insofar as that Resolution is an integral part of the rescission of Resolutions 1520, 1524 and 1531, and would seek to restore the segregated conditions which existed prior to the adoption of Resolutions 1520, 1524 and 1531.

The defendants, their agents and servants are further ordered to make effective the following integration policies:

Resolution 1520 insofar as it applies to Smiley Junior High School (specifically, paragraphs six and seven of the boundary changes embodied in the said Resolution 1520);

Resolution 1524 insofar as it applies to Smiley Junior High School (specifically, paragraphs one through nine, inclusive, of the boundary changes embodied in Resolution 1524) (paragraphs eight and nine being necessary to the desegregation of Smiley Junior High School). Paragraphs A, B, C, and D of Resolution 1524, which deal with Cole Junior High School, are not here considered, but nothing herein contained is intended to prevent the implementation of those boundary changes. Ruling on these changes is reserved until the trial.

Resolution 1531 insofar as it applies to boundary changes concerning Barrett, Park Hill and Philips Elementary Schools, and insofar as it directs the Superintendent to establish Hallett Elementary School as a demonstration integrated school through voluntary transportation and to continue the practice of transporting students from Stedman Elementary School to relieve overcrowding and to permit the removal of mobile classroom units at that school.

Resolutions 1520, 1524 and 1531 do not expressly call for compulsory transportation; however, the Board has had for many years and now has a policy of transporting students who live a certain distance from their schools. Such transportation is probably necessary in order to carry out this decree, but nothing in this order shall be construed to require the Board to use such transportation if it can be dispensed with.

Nothing in this order shall prevent the School Board from proposing and submitting to this Court any other plan for integration.

Rulings concerning East High School and Cole Junior High School are hereby reserved pending consideration of this action at the trial on the merits.

This temporary injunction shall continue during the pendency of this suit and until the action is tried on its merits.

APPENDIX A

## OPINION AS TO APPLICABILITY OF SECTION 407(a) OF THE CIVIL RIGHTS ACT OF 1964

The Court of Appeals for the Tenth Circuit has remanded this case in part for this Court's prior determination of the applicability and effect of Section 407(a) of the Civil Rights Act of 1964 (42 U.S.C. § 2000c–6(a)), which Section contains the following proviso:

> provided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards.

We have considered the arguments of counsel, both oral and in briefs. We conclude that the above proviso does not limit the power of this Court to direct the School Board to implement Resolutions 1520, 1524 and 1531 to the extent ordered.

■ Section 407(a) refers to actions brought by the Attorney General of the United States under the authority granted him by that Section. The proviso appears in this context, and thus on its face does not apply to a case such as this, which is not brought by the Attorney General. Defendants call our attention to a comment made by then Senator Humphrey during Congressional debate on the Act to the effect that the proviso applies to the entire 1964 Civil Rights Act. Assuming that construction to be correct, the instant case is not brought under the 1964 Civil Rights Act but rather under 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

The legislative history of Section 407 (a) indicates that the proviso meant only that Congress was not taking a position on the question of the propriety of transportation to achieve racial balance in a case of *de facto* segregation. *See*

United States v. Jefferson County Bd. of Ed., 372 F.2d 836, 880 (5th Cir. 1966), *aff'd on rehearing with order modified,* 380 F.2d 385 5th Cir. 1967) (en banc).

■ We have concluded that the instant case is one in which the Board has actively contributed to the segregated conditions found to exist. The act applies, if at all, to a *de facto* segregation situation. The Court of Appeals for the Seventh Circuit made this distinction in United States v. School District 151 of Cook County, Illinois, 404 F.2d 1125 (7th Cir. 1968), where it was held that the proviso in Section 407(a) had no application where transportation was "not done to achieve racial balance, although that may be a result, but to counteract the legacy left by the Board's history of discrimination." 404 F.2d at 1130. Counteracting a legacy is precisely what the order in the instant case is intended to do.

■ The language of the proviso indicates that its purpose was to prevent the implication that Section 407(a) enlarged the powers of the federal courts. The proviso states that the Section grants a court no power to order transportation to achieve racial balance, nor does the Section "otherwise enlarge the existing power of the court to insure compliance with constitutional standards." The equitable powers of the courts in directing compliance with constitutional mandates exist independent of the 1964 Civil Rights Act. United States v. Jefferson County Bd. of Ed., 372 F.2d 836, 880 (5th Cir. 1966). The proviso merely explains that Section 407(a) is not to be construed to enlarge the powers of the courts; it does not limit those powers.

It would be inconsistent to construe the proviso as a limitation on the power of the courts to correct a deprivation of rights which Section 407(a) itself is intended to remedy. The Congressional policy behind the 1964 Act should not be diluted by such a construction.

In United States v. School District 151 of Cook County, Illinois, 286 F.Supp. 786

(N.D.Ill.1968), the district court considered the instant question and concluded:

> That provision of 42 U.S.C. § 2000c–6 which withholds from the courts the power to require transportation of pupils to overcome racial imbalance in public schools must be construed to relate to so-called de facto or adventitious segregation. It is inapplicable where, as here, the existing segregation of pupils and teachers is inseparable from the practices and policies of the defendants. 286 F.Supp. at 799.

In affirming this construction of the statute the Court of Appeals for the Seventh Circuit used the following strong language:

> Defendants next contend that they have no constitutional duty to bus pupils, in the District, to achieve a racial balance. It is true that 42 U.S.C. § 2000c–6 withholds power from officials and courts of the United States to order transportation of pupils from one school to another for the purpose of achieving racial balance. However, this question is not before us. Although we recognize that past residential segregation itself, in the District, severely unbalanced racially the school population, the district court's judgment is directed at the unlawful segregation of Negro pupils from their White counterparts which is a direct result of the Board's discriminatory action. Therefore, the district court's order is directed at eliminating the school segregation that it found to be unconstitutional, by means of a plan which to some extent will distribute pupils throughout the District, presumably by bus. This is not done to achieve racial balance, although that may be a result, but to counteract the legacy left by the Board's history of discrimination.
>
> The Constitution forbids the enforcement by the Illinois School District of segregation of Negroes from Whites merely because they are Negroes. The congressional withholding of the power of courts in Section 2000c–6 cannot be interpreted to frustrate the constitutional prohibition. The order here does not direct that a mere imbalance of Negro and White pupils be corrected. It is based on findings of unconstitutional, purposeful segregation of Negroes, and it directs defendants to adopt a plan to eliminate segregation and refrain from the unlawful conduct that produced it. United States v. School District 151 of Cook County, Illinois, 404 F.2d 1125, 1130 (7th Cir. 1968).

Judge Wisdom, writing for the Court of Appeals for the Fifth Circuit in the *Jefferson County* case, also considered the applicability of the statute to a *de jure* case and determined that it did not apply.

The above are the sum total of court decisions on the subject. However, they dispel any doubt as to its applicability.

We add that in reevaluating the case in light of the statute and in reconsidering Resolutions 1520, 1524 and 1531, we determined that the effort in 1520 to desegregate East High School was not within the ambit of a preliminary injunction either because of the statute or for the equally good reason that the evidence as of now fails to disclose a condition at East which merits a preliminary injunction.