Ronald BRADLEY et al., Plaintiffs-Appellants,

v.

William G. MILLIKEN, Governor of Michigan, et al., Defendants-Appellees.

No. 20794.

United States Court of Appeals, Sixth Circuit.

Oct. 13, 1970.

Louis R. Lucas, Memphis, Tenn., and Paul Dimond, Center of Law and Edu-

cation, Harvard University, Cambridge, Mass., William E. Caldwell, Ratner, Sugarmon & Lucas, Memphis, Tenn., Nathaniel Jones, General Counsel, N. A. A. C. P., New York City, Bruce Miller and Lucille Watts, Detroit, Mich., for Legal Redress Committee, N. A. A. C. P., Detroit Branch, on the brief; J. Harold Flannery, Cambridge, Mass., of counsel, for appellants.

Eugene Krasicky, Lansing, Mich., and George E. Bushnell, Jr., Detroit, Mich., for appellees.

Frank J. Kelley, Atty. Gen., Eugene Krasicky, Asst. Atty. Gen., Robert A. Derengoski, Sol. Gen., Lansing, Mich., on the brief, for William G. Milliken, Frank J. Kelley and John W. Porter.

Miller, Canfield, Paddock and Stone, by George E. Bushnell, Jr. and Carl H. von Ende, Detroit, Mich., on the brief for Board of Education, Patrick McDonald, James Hathaway and Cornelius Golightly and Norman Drachler.

Before PHILLIPS, Chief Judge, and EDWARDS and PECK, Circuit Judges.

PHILLIPS, Chief Judge.

This case involves an effort by the Detroit Board of Education, as constituted on April 7, 1970, to effect a more balanced ratio of Negro and white students in twelve senior high schools. This effort was thwarted by an Act of the Michigan Legislature, Act No. 48, effective July 7, 1970, a copy of which is made an appendix to this opinion.

The appeal is under 28 U.S.C. § 1292 (a) from the interlocutory order of the District Court entered September 3, 1970, which, among other things, refused to grant a preliminary injunction.

The plaintiffs are pupils and parents of pupils who attend the Detroit Public Schools, and the Detroit Branch of the National Association for the Advancement of Colored People. The defendants are the Governor of Michigan, the Attorney General of Michigan, the Acting State Superintendent of Public Instruction, the State Board of Education, the Board of Education of the City of Detroit, three members of the latter board,[1] and the Superintendent of the Detroit Public Schools.

On April 7, 1970, the Detroit Board of Education adopted a plan which provided for changes in twelve high school attendance zones, designed to effect a more balanced ratio of Negro and white students at the senior high school level. The plan was applicable to twelve of the twenty-one high schools in Detroit that serve particular neighborhood or geographical areas. The April 7 plan was to take effect over a three-year period, applying initially to those students entering the tenth grade in September 1970 at the beginning of 1970–71 school year. In successive stages the eleventh grade was to have been affected at the opening of the 1971–72 school year, and the twelfth grade at the beginning of the 1972–73 school year.

Dr. Norman Drachler, the Superintendent of the Detroit Public Schools, testified that the plan was adopted after an extended study. He described the purpose of the plan as follows:

"Q What was the purpose of the plan as adopted?

"A The purpose of the plan was, in addition to complying with the regulations of the State Act 244, to bring about a decentralized school system within the city which would allow for the election of regional boards which would bring about greater participation at the local level by the community. That it would undoubtedly, in the opinion of most of us, add towards the improvement of quality education, quality integrated education insofar as possible.

[1]. The Detroit Board of Education normally consists of seven members. At the time the complaint was filed four of the members had been recalled in an election held August 4, 1970. On August 31, 1970, the Governor appointed four new members to the vacancies created by the recall vote.

"The Board of Education has, as long as I can recall, always accepted the premise that the task of improving education is a very complex one in a large city, but they have consistently held to the premise that wherever possible, wherever reasonably we can bring about integration in the process of developing our educational program, that this would enhance the opportunity of all children, black and white, both in terms of their educational achievement as well as their potential as responsible citizens in a democracy.

"So in this plan the Board saw an opportunity, the majority, that we could at the high school level in some twelve high schools bring about over a three-year period a certain amount of integration although it involved only the movement of some ten to twelve thousand children over the three-year period, nevertheless, that is, the transfer of 12,000 children in three years—nevertheless these children were in twelve schools which involved about 35,000 students, which is over 50 per cent of our total high school enrollment.

"We have certain high schools that are already integrated. Thus, we saw this as a step not only toward achieving a goal of the decentralization act but also the broader goal which the Board has always had of quality integrated education."

The Board of Education adopted the plan by a vote of four to two, with one member absent because of illness. This seventh member, who is represented to have favored the plan but was unable to vote, has since died and his vacancy has been filled.

At the time the April 7 plan was adopted, Dr. Drachler, the Superintendent of Public Schools, issued the following statement:

"As an educator I support the proposed plan because I believe that it is educationally, morally and according to our attorney legally sound. Most of the research and scholarship, both by blacks and whites that I respect, supports the view that integration, racial, religious and economic, has a positive effect on the learning of all children in a pluralistic society. As a student of American educational history I recognize that the above goal has been the dream of our nation for over a century. Local, state and national polls assert that the majority of our people concur with the desirability of integration and believe that eventually it will be a reality in our nation.

"Let us, therefore, have a plan for self renewal of our schools and our community rather than drift in the climate of uncertainty, fear and frustration. I recognize that our primary objective as teachers is quality education but to repeat, the majority of accepted research and scholarship asserts that quality education in a heterogeneous society such as ours can not be attained to its fullest measure without integration. It is essential for white and black, for poor and rich.

"This plan directly affects only our high school students. Without it each constellation will continue a growing pattern of segregated racial or economic enclaves and be concerned only with the educational welfare of its own immediate area. This proposal, however, encourages a broader community concern for educational improvement and assures greater interest and support for quality education for tens of thousands of children wherever they attend school.

"Since as a people we concur with the necessity for eliminating religious, racial and economic barriers, let us, therefore, begin with a plan, however limited it is, let us begin where we are and move forward.

"America has been willing to deprive itself of billions of dollars to travel

250,000 miles in space to reach the moon, I am confident Detroiters will be willing to accept the idea of traveling one or two additional miles to school for the sake of a better education for our young people and for a better future for our city."

The plan was approved by the Michigan Association for Supervision and Curriculum Development by the following resolution:

"Whereas racial integration is legally, morally and scientifically right, and Whereas, the President of the United States has stated that 'quality is what education is all about' desegregation is vital to that quality, and, Whereas, the Board of Education of the Detroit Public Schools has approved a plan for high school students which effectively increases racial integration, therefore, Be It Resolved, that the Michigan Association for Supervision and Curriculum Development recognizes, endorses and vigorously supports this long needed and forward step for the future of America."

The plan was endorsed by other national and local agencies and organizations, including the United States Office of Education, the defendant Michigan State Board of Education and the Michigan Civil Rights Commission.

Following adoption of the plan on April 7, 1970, Detroit School officials began to prepare procedures to carry it into effect at the beginning of the 1970–71 school year.

The Michigan Legislature enacted, and on July 7, 1970, the Governor of Michigan signed into law, Act No. 48, Public Acts of 1970.

Section 12 of this Act is as follows:

"Sec. 12. The implementation of any attendance provisions for the 1970–71 school year determined by any first class school district board shall be delayed pending the date of commencement of functions by the first class school district boards established under the provisions of this amendatory act but such provision shall not impair the right of any such board to determine and implement prior to such date such changes in attendance provisions as are mandated by practical necessity. In reviewing, confirming, establishing or modifying attendance provisions the first class school district boards established under the provisions of this amendatory act shall have a policy of open enrollment and shall enable students to attend a school of preference but providing priority acceptance, insofar as practicable, in cases of insufficient school capacity, to those students residing nearest the school and to those students desiring to attend the school for participation in vocationally oriented courses or other specialized curriculum."

By its terms this statute applies only to "first class school districts." The Detroit School system is the only "first class school district" in Michigan. Although on its face the statute is a general Act, it is applicable only to one local school system in the State.[2]

Following enactment of Act 48, the Superintendent of Detroit City Schools requested an opinion from the attorney for the Board of Education as to the effect of this statute. This opinion, dated July 28, 1970, contains the following language with respect to § 12:

"The answer to this question is found in Section 12 of Act 48. Section 12 says:

'The implementation of any attendance provisions for the 1970–71

---

2. Since the statute is local in application, it is conceded by all parties that its constitutionality can be determined by a one-judge District Court and by this Court on appeal, and that it is not necessary to convene a three-judge District Court under 28 U.S.C. § 2281. Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643; Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 227, 84 S.Ct. 1226, 12 L.Ed.2d 256; Rorick et al. v. Board of Comm'rs of Everglades Drainage Dist. et al., 307 U.S. 208, 212, 59 S.Ct. 808, 83 L.Ed. 1242.

school year determined by any first class school district board shall be delayed pending the date of commencement of functions by the first class school district boards established under the provisions of this amendatory act * * *.'

"This quoted portion of Section 12 obviously, albeit indirectly, addresses itself to the action taken by the Board on April 7, 1970, with respect to establishing new high school attendance areas. In our opinion, the effect of this provision is to rescind—for at least one year—the attempt made by the Board of Education on April 7, 1970, to achieve integration in its high schools. While Act 48 itself purports only to delay implementation until January 1, 1971, it is well known that no implementation begun even on January 1, 1971, could be placed into operation earlier than the beginning of the Fall semester in September, 1971. For these reasons we deem it unnecessary to recommend that the Board's action on April 7, 1970, establishing high school attendance areas be rescinded."

Further, a movement was initiated by certain Detroit voters to recall the four members of the Detroit School Board who had voted in favor of the April 7, 1970, plan. The recall movement was resolved at the August 4, 1970, election, which resulted in the recall and removal from office of the four board members who voted in favor of the April 7 plan. As stated in footnote 1, these four positions were vacant at the time the complaint was filed and on August 31, 1970, were filled by appointment by the Governor.

In accordance with the opinion of the attorney for the Board of Education quoted above, Detroit school officials did not put the April 7 plan into effect for the 1970–71 school year beginning in September 1970. The Superintendent of City Schools testified that he instructed regional superintendents that "we had to go back to the plan of April 6." The principals of the affected high schools sent out letters or otherwise notified students that regardless of any previous instructions to the contrary, they should attend the high school they would have attended prior to April 7. It is undisputed, that, obedient to the mandate of § 12 of Act 48, the plan adopted by the Board of Education on April 7, has been suspended, or at least deferred to a time beyond January 1, 1971. The high schools in question have reverted to the attendance zones which were in effect prior to the April 7 action of the Board. The tenth grade students who would have attended a high school with an improved racial balance as determined by the Board of Education on April 7 have been deprived of that opportunity from the beginning of the 1970–71 school year until the time of the rendering of this opinion.

On August 18, 1970, plaintiffs filed their complaint in the present case as a class action, attacking the constitutionality of § 12 of Act 48. Among other things the complaint prayed for a preliminary injunction requiring defendants to put into effect the plan adopted by the Detroit Board of Education on April 7 and restraining defendants from giving any force or effect to § 12 of Act 48 insofar as it would inhibit immediate implementation of the Board's plan of April 7.

District Judge Stephen J. Roth advanced the case and scheduled a prompt hearing. Evidentiary hearings were conducted by Judge Roth for three days on August 27–28, and September 1, 1970. The testimony at these hearings comprises three typewritten volumes. On September 3, 1970, Judge Roth released a written opinion denying the application for a preliminary injunction and granting a motion to dismiss the Governor and Attorney General of Michigan as parties defendant. The District Court did not pass upon the issue of the constitutionality of § 12 of Act 48.

The case was advanced on the docket of the District Court for hearing on its merits beginning November 2, 1970. The trial is scheduled to start on that

date. Two weeks have been allotted by the District Court for this trial.

On September 3, the same day the decision of the District Court was announced, defendants filed a notice of appeal and a motion in this Court for injunction pending appeal. Oral arguments on this motion were heard in Nashville, Tennessee, by the Chief Judge of the Circuit September 8, 1970, pursuant to Rule 8, Fed.R.App.P.[3] The Detroit public schools opened for the 1970–71 school term on September 8, the day of the hearing before the Chief Judge in Nashville.

The Chief Judge entered an order denying the application for injunction pending appeal and advanced the appeal for hearing on its merits before this Court in Cincinnati, Ohio, on October 2, 1970, at 2 p.m. This opinion is rendered after consideration of the briefs and oral arguments of the parties and the record and transcript of the evidence and proceedings in the District Court.

Three questions will be disposed of at the present stage of the proceeding:

(1) The issue of the constitutionality of § 12 of Act 48 (Appendix hereto);

(2) Whether the District Judge abused his discretion in denying the application for a preliminary injunction;

(3) Whether the District Court erred in dismissing the Governor and Attorney General as parties defendant.

### 1) The Michigan Statute

We first consider the issue of the constitutionality of the statute.

As previously stated, the plan adopted by the Detroit Board of Education was designed to provide a better balance between students of the Negro and white races in twelve high schools. If this plan had come into existence under a judgment of the United States District Court for the Eastern District of Michi-

gan, there could be no question that § 12 of Act 48 would be void. The Legislature of a State cannot annul the judgments nor determine the jurisdiction of the Courts of the United States. United States v. Peters, 9 U.S. 115, 3 L.Ed. 53 (1809).

In the present case the April 7 plan came into being, not as the result of a judgment of a District Court, but by the voluntary action of the Detroit Board of Education in its effort further to implement the mandate of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, and succeeding cases, such as Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19, and Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716. The implementation of the April 7 plan was thwarted by State action in the form of the Act of the Legislature of Michigan.

In numerous decisions the Supreme Court and other federal courts have held that State action in any form, whether by statute, act of the executive department of a State or local government, or otherwise, will not be permitted to impede, delay or frustrate proceedings to protect the rights guaranteed to members of all races under the Fourteenth Amendment. See:

Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616, holding that the repeal by referendum of the fair housing ordinance previously adopted by the City Council of Akron, Ohio, "discriminates against minorities, and constitutes a real, substantial, and invidious denial of the equal protection of the laws." 393 U.S. at 393, 89 S.Ct. at 562.

Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830, holding invalid a provision of the Constitution of California, adopted by state-wide refer-

---

3. Rule 8 provides: "The motion * * * normally will be considered by a panel or division of the court, but in exceptional cases where such procedure would be im-

practicable due to the requirements of time, the application may be made to and considered by a single judge of the court."

endum, which nullified previously enact-ed statutes regulating racial discrimina-tion in housing and authorized "racial discrimination in the housing market." 387 U.S. at 381, 87 S.Ct. at 1634.

Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256, and cases cited therein, invalidating the "massive resistence" legislation enacted by the Vir-ginia Legislature designed to prevent or delay school integration, and requiring reopening of public schools of Prince Ed-wards County.

Cooper v. Aaron, 358 U.S. 1, 9, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19, nullifying a 1956 amendment to the Constitution of Arkan-sas which commmanded the Arkansas legislature to oppose "in every constitu-tional manner the unconstitutional deseg-regation decisions" of the Supreme Court, and various State statutes enacted for that purpose.

Kelley v. Board of Education of City of Nashville, 270 F.2d 209 (6th Cir.), cert. denied, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240, holding a Tennessee stat-ute authorizing separate segregated schools on a voluntary basis to be "pa-tently and manifestly unconstitutional on its face." 270 F.2d at 231.

Lee et al. v. Nyquist, Commissioner of Education of the State of New York, (W.D.N.Y.) 318 F.Supp. 710 (three-judge court, Sept. 29, 1970), which held invalid under the equal protection clause of the Fourteenth Amendment § 3201(2) of the New York Education Law, McKin-ney's Consol.Laws, c. 16, which "pro-hibits state education officials and ap-pointed school boards from assigning stu-dents, or establishing, reorganizing or maintaining school districts, school zones or attendance units for the purpose of achieving racial equality in attendance." 318 F.Supp. 713.[4]

Keyes v. School District Number One, Denver, Colorado, 313 F.Supp. 61, 303 F.Supp. 279, and 303 F.Supp. 289 (D.

Colo.), 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 37, involving a school desegre-gation plan adopted by a school board and an effort to rescind this plan made by the same Board after changes in membership following a school board election.

Holmes v. Leadbetter, 294 F.Supp. 991 (E.D.Mich.) enjoining a proposed refer-endum to submit an open housing ordi-nance to voters of Detroit.

Bush v. Orleans Parish School Board, 188 F.Supp. 916 (E.D.La.), aff'd, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806, holding invalid twenty-five measures adopted by the Louisiana Legislature in an effort to circumvent partial desegre-gation of New Orleans public schools.

Aaron v. McKinley, 173 F.Supp. 944 (E.D.Ark.), aff'd, sub nom. Faubus, Governor v. Aaron, 361 U.S. 197, 80 S.Ct. 291, 4 L.Ed.2d 237, holding uncon-stitutional two Arkansas statutes author-izing the Governor to close schools and to call for school district elections on the question of whether schools in such dis-tricts be integrated, and withholding State school funds from districts in which schools have been closed because of integration.

The foregoing are a few cases selected from the many decisions holding that State action cannot be interposed to de-lay, obstruct or nullify steps lawfully taken for the purpose of protecting rights guaranteed by the Fourteenth Amend-ment.

Defendants assert that § 12 is a valid exercise of legislative power. It is true that, as a general rule, a State legis-lature has plenary power over the arms and instrumentalities of State govern-ment, including local boards of education. This power cannot be exercised, however, so as to deprive individuals of constitu-tionally protected rights. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, distinguishing City of Trenton v. New Jersey, 262 U.S. 182,

4. The case of North Carolina State Board of Education v. Swann, 391 U.S. ——, 91 S.Ct. 11, 27 L.Ed.2d 34, involving the validity of the North Carolina anti-busing law, is now pending before the Supreme Court of the United States.

43 S.Ct. 534, 67 L.Ed. 937, Hunter v. City of Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151, and related cases. Mr. Justice Frankfurter, speaking for the Court in *Gomillion,* said:

> "When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right. This principle has had many applications. It has long been recognized in cases which have prohibited a State from exploiting a power acknowledged to be absolute in an isolated context to justify the imposition of an 'unconstitutional condition.' What the Court has said in those cases is equally applicable here, *viz.,* that 'Acts generally lawful may become unlawful when done to accomplish an unlawful end, United States v. Reading Co., 226 U.S. 324, 357, 33 S.Ct. 90, 57 L.Ed. 243, and a constitutional power cannot be used by way of condition to attain an unconstitutional result.' Western Union Telegraph Co. v. Foster, 247 U.S. 105, 114, 38 S.Ct. 438, 439, 62 L.Ed. 1006."

364 U.S. at 347, 81 S.Ct. at 130.

Defendants rely upon the decision of this Court in Deal v. Cincinnati Board of Education, 369 F.2d 55, cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114, 419 F.2d 1387 (6th Cir.). *Deal* is distinguishable on its facts from the present case. In *Deal* this Court held that the school board of a long-established unitary non-racial school system had no constitutional obligation to bus white and Negro children away from districts of their residences in order that racial complexion be balanced in each of the many public schools in the City. In the present case the Detroit Board of Education in the exercise of its discretion took affirmative steps on its own initiative to effect an improved racial balance in twelve senior high schools. This action was thwarted, or at least delayed, by an act of the State Legislature. No comparable situation was presented in *Deal.*

Defendants defend the constitutionality of the second sentence of § 12 of Act 48 on the ground that the word "shall," which appears twice in that sentence, was intended to mean "may," and that the sentence is not mandatory. We reject this interpretation of the sentence. We find nothing in the Act to indicate any intention on the part of the Legislature to leave the application of this sentence to the discretion of local school officials. We are cited to nothing in the legislative history to support such an interpretation. The word "shall" is ordinarily "the language of command." Anderson v. Yungkau, 329 U.S. 482, 485, 67 S.Ct. 428, 91 L.Ed. 436; Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566. We interpret the word "shall" in the second sentence of § 12 as meaning precisely what the Michigan legislature said. We conclude that this sentence was enacted with the intention that it be mandatory.

We hold § 12 of Act 48 to be unconstitutional and of no effect as violative of the Fourteenth Amendment. By this ruling on the invalidity of § 12, we express no opinion at the present stage of the case as to the merits of the plan adopted by the School Board on April 7, 1970, or as to whether it was the constitutional obligation of the School Board to adopt all or any part of that plan.

### 2) Denial of Preliminary Injunction

Although holding that § 12 of Act 48 is unconstitutional, we cannot say that the District Judge abused his discretion in refusing to grant a preliminary injunction upon the basis of the evidence introduced during the three days of hearings.

The granting or denial of a preliminary injunction pending final hearing on the merits is within the sound judicial discretion of the District Court. On appeal, the action of the District Court denying a preliminary injunction will not be disturbed unless contrary to some rule of equity or result of improvident exercise of judicial discretion.

Nashville I-40 Steering Committee v. Ellington, 387 F.2d 179 (6th Cir.), cert. denied, 390 U.S. 921, 88 S.Ct. 857, 19 L.Ed.2d 982.

The complaint in the present case seeks relief going beyond the scope of the plan of April 7, 1970, and Act 48, such as the assignment of teachers, principals and other school personnel to each school in accordance with the ratio of white and Negro personnel throughout the Detroit school system, and an injunction against all future construction of public school buildings pending Court approval. As previously stated, the District Judge not only conducted an expeditious hearing on the application for a preliminary injunction, but has advanced the case on his docket to November 2, 1970, and allotted two weeks for the trial.

We conclude that the issues presented in this case, involving the public school system of a large city, can best be determined only after a full evidentiary hearing.

In the trial of the case on its merits, the District Judge is directed to give no effect to § 12 of Act 48, because of its unconstitutionality.

*3) The Governor and Attorney General as parties defendant*

Defendants appeal from the order of the District Court dismissing the Governor and Attorney General of Michigan as parties defendant. We hold that the Governor and Attorney General are proper parties, at least at the present stage of the proceeding. Compare: Sterling v. Constantin, 287 U.S. 378, 393, 53 S.Ct. 190, 77 L.Ed. 375; Ex parte Young, 209 U.S. 123, 157, 161, 28 S.Ct. 441, 52 L.Ed. 714; Arneson v. Denny, 25 F.2d 993 (W.D.Wash.); James v. Almond, 170 F.Supp. 331, 341–342 (E.D. Va.), appeal dismissed, 359 U.S. 1006, 79 S.Ct. 1146, 3 L.Ed.2d 987; Bevins v. Prindable, 39 F.Supp. 708, 710 (E.D.Ill.), aff'd, 314 U.S. 573, 62 S.Ct. 116, 86 L.Ed. 465.

That part of the order of the District Court dismissing the Governor and Attorney General of Michigan as parties defendant is reversed.

Affirmed in part, reversed in part and remanded to the District Court for further proceedings not inconsistent with this opinion.

## APPENDIX

### TEXT OF ACT 48—PUBLIC ACT OF 1970

Approved by the Governor—July 7, 1970

State of Michigan—75th Legislature— Regular Session of 1970

An Act to amend the title and sections 4, 5, 6 and 7 of Act No. 244 of the Public Acts of 1969, entitled "An act to require first class school districts to be divided into regional districts and to provide for local district school boards and to define their powers and duties and the powers and duties of the first class district board," being sections 388.174, 388.175, 388.176 and 388.177 of the Compiled Laws of 1948; to add sections 1a, 2a, 3a and 8 to 13; and to repeal certain acts and parts of acts.

The People of the State of Michigan enact:

Section 1. The title and sections 4, 5, 6 and 7 of Act No. 244 of the Public Acts of 1969, being sections 388.174, 388.-175, 388.176 and 388.177 of the Compiled Laws of 1948, are amended and sections 1a, 2a, 3a and 8 to 13 are added to read as follows:

### TITLE

An act to require first class school districts to be divided into regions and to provide for regional boards and to define their powers and duties and the powers and duties of the first class district board.

Sec. 1a. On or after January 1, 1971, in any first class school district with more than 100,000 student membership, the board membership of the board of education shall be composed of 8 members determined and elected as provided

in section 2a plus 5 members determined and elected as provided in section 3a.

Sec. 2a. Immediately following the effective date of this 1970 amendatory act or any date on which a school district becomes a first class school district, 8 regions shall be described in each such first class school district by resolution concurred in by three-fourths of the members elected and serving in each House of the legislature and such regions so described shall be established as regions if and when approved by the superintendent of public instruction. If a concurrent resolution shall not be approved by three-fourths of such members within 7 days of the effective date of this amendatory act or within 30 days of any date on which a school district becomes a first class school district a first class district boundary commission consisting of 3 members appointed by the governor shall determine the boundary lines of such regions within 21 days thereafter if in 1970 or within 30 days thereafter if in any later year. The members of the commission shall receive a compensation of $100.00 per diem per member from the funds appropriated to the department of education. The boundary lines of such regions shall be redetermined by the respective boards of such first class school districts following each federal decennial census but in no event later than April 15 of the first odd numbered year in which regional board members are to be elected following the federal decennial census. In the event of the failure of such respective boards of such first class school districts to redetermine such regional boundary lines by such April 15, the state board of education shall convene within 10 days to make such redetermination and such redetermination of the state board of education shall be the regional boundary lines until the redetermination is made following the next succeeding federal decennial census as provided in this section. Regions shall be as compact, contiguous and nearly equal in population as practicable.

Within each region, there shall be a regional board consisting of 5 members. The members shall be nominated and elected by the registered and qualified electors of each district as is provided by law for the nomination and election of first class school board members except that signatures required on nominating petitions shall be not less than 500 nor more than 1,000. Any candidate properly filed for any educational position in any first class school district as of the effective date of this act shall be considered as a qualified candidate under sections 2a and 3a for the 1970 election provided such candidate makes a request, designation and selection to the election officer empowered by law to accept nominating petitions for such office. No person shall be elected who is not a resident of the region from which he is elected. The members shall be elected in the general election to be held in November, 1970 and November of 1973 and every 2 years thereafter commencing in 1975.

In the year 1970 regional board members shall be elected in the November general election and candidates for such offices shall not be subject to the primary election. In 1970 a person may qualify as a candidate for the election for regional board member by filing the required number of signatures on or prior to 4 p. m., August 18, 1970. In 1970 signatures of registered electors of the first class district shall be valid without regard to the place of residence of such registered elector. In any year the candidate for regional board member receiving the highest number of votes in each region in the November general election shall be chairman of the regional board and a member of the board of education of his first class school district during his term of office. In case a vacancy occurs for any reason in the combined position of chairman of the regional board and member of the first class school district board of education, the regional board member who received the next highest number of votes in the preceding general election shall assume

such combined position. The number of members of each regional board shall be maintained at 5 and vacancies shall be filled from among residents of the region by the remaining board members of such region by a majority vote of those serving. No vacancies shall be filled later than 60 days prior to a primary election at which regional board members are to be nominated. The 5 regional board members elected in each region shall commence their terms of office on January 1 following the election and the members shall serve until their successors are elected and qualified.

Sec. 3a. Effective January 1, 1971 there shall be 5 members on the boards of first class school districts elected at large. Members of such boards shall be nominated and elected at the primary and general elections of 1972 and 1974 for 3-year terms commencing on January 1 of the subsequent odd number year, 2 each to be elected in 1972 and 1974. In the year 1970 1 board member shall be elected in the November general election for a 3-year term commencing January 1, 1971 and candidates shall not be subject to the primary election. In 1970 a person may qualify as a candidate for the election for first class school district board member by filing nominating petitions containing not less than 500 nor more than 1,000 valid signatures on or before 4 p. m., August 18, 1970. Commencing in 1973 and in all subsequent odd numbered years, a number of board members equivalent to the number of members whose terms expire on December 31 of such year will be nominated and elected at the primary and general election. Such members so elected shall serve 2-year terms commencing on January 1 of the subsequent even numbered year. To accomplish the provisions of this amendatory act the terms of office of any first class district board members whose terms expire prior to December 31, 1971 shall expire December 31, 1970; the terms of office of such board members whose terms expire between January 1, 1972 and December 31, 1973 shall expire December 31, 1972 and

the terms of office of such board members whose terms expire between January 1, 1974 and December 31, 1975 shall expire December 31, 1974.

In any year in which one or more board members of a first class district are commencing a term of office on January 1 the board of such first class district shall redetermine its selection of officers during the month of January of such year. Petitions to recall any member or members of the board of education of a first class school district filed and pending before this act becomes effective, or becomes operative in a school district that hereafter becomes a first class school district, may be withdrawn by the person or organization filing or sponsoring such recall petitions within 10 days after this act becomes effective or 20 days after the act becomes operative in any school district that hereafter becomes a first class school district. Board members of first class school districts who are recalled in accordance with law may be candidates for the same office at the next election for such office at which the recalled member is otherwise eligible. In the case of any school district that hereafter becomes a first class school district, the term of office of each of the board members then serving in such school district shall expire on the next succeeding December 31 of an odd numbered year, provided however that if the school district becomes a first class school district later than April 1 of an odd numbered year, the term of office of each of its board members shall expire on December 31 of the next succeeding odd numbered year later than the year in which the district became a first class school district. For any district becoming a first class district 5 school board members shall be elected in the general election of the odd numbered year in which such terms of office expire and the 5 school board members so elected shall commence 2-year terms on January 1 of the even numbered year following such general election.

In case a vacancy occurs for any reason on the first class district board such

vacancy shall be filled by majority vote of all persons serving as regional board and first class district board members at a meeting called by the president of the first class district board for such purpose. No vacancies shall be filled later than 60 days prior to a primary election at which first class district board members are to be nominated. Vacancies which shall occur prior to the effective date of this act or have occurred in 1970, shall be filled for a term ending December 31, 1972 in the same manner as provided in this section for the election of board members at large in the year 1970 and such positions shall then be filled in the primary and general election of 1972 for a 3 year term. In 1970 the candidate receiving the highest number of votes shall be elected for the 3 year term and the candidates receiving the next highest number of votes shall be elected for 2 year terms to fill vacancies.

Sec. 4. A candidate for a regional board must be 21 years of age at the time of filing and must reside in the region in which he becomes a candidate. If his legal residence is moved from the region during his term of office, it shall constitute a vacating of office.

Sec. 5. The first class school district board shall retain all the powers and duties now possessed by a first class school district except for those given to a regional board under the provisions of this act and such other functions as are delegated to the regional boards by the first class school district board.

Sec. 6. Effective upon the commencement of its term of office, the regional board, subject to guidelines established by the first class district board, shall have the power to:

(1) Employ a superintendent for the schools in the region from a list or lists of candidates submitted by the first class district board and to discharge any such regional superintendent.

(2) Employ and discharge, assign and promote all teachers and other employees of the region and schools therein subject to review by the first class school dis-trict board, which may overrule, modify or affirm the action of the regional board.

(3) Determine the curriculum, use of educational facilities and establishment of educational and testing programs in the region and schools therein.

(4) Determine the budget for the region and schools therein based upon the allocation of funds received from the first class school district board.

Sec. 7. The rights of retirement, tenure, seniority and of any other benefits of any employee transferred to a region or schools therein from the first class district or transferred between regions shall not be abrogated, diminished or impaired.

Sec. 8. The first class school district board shall perform the following functions for the regions and schools therein:

(1) Central purchasing.

(2) Payroll.

(3) Contract negotiations for all employees, subject to the provisions of Act No. 336 of the Public Acts of 1947, as amended, being sections 423.201 to 423.216 of the Compiled Laws of 1948, and subject to any bargaining certification and to the provisions of any collective bargaining agreement pertaining to affected employees.

(4) Property Management and Maintenance.

(5) Bonding.

(6) Special education programs.

(7) Allocation of funds for capital outlay and operations for each region and schools therein.

(8) Establish or modify guidelines for the implementation of the provisions of section 6. Such guidelines shall include but not be limited to the determination and specification of each regional board's jurisdiction and may provide for regional board's jurisdiction over schools not geographically located within their respective regions.

Sec. 9. Facilities and accommodations provided by the first class school district board for regional boards shall be

selected with due consideration for accessibility, economy and utilization of existing facilities. Employees assigned by the first class school district board to regional boards at the time of commencement of their functions shall be drawn, to the extent feasible, from persons employed at such time by the first class school district.

Sec. 10. Regional board members shall be paid a per diem allowance of $20.00 for each meeting of their board attended and first class district board members shall be paid a per diem allowance of $30.00 for each meeting of their board attended, but in neither case shall such payments be for meetings in excess of 52 meetings per annum. The chairman of each regional board shall be paid for up to 52 regional board meetings attended and up to 52 first class district board meetings attended.

Sec. 11. First class school districts with 100,000 student membership or more shall have the same rights for initiative petition and referendum now granted by law to second and third class districts.

Sec. 12. The implementation of any attendance provisions for the 1970–71 school year determined by any first class school district board shall be delayed pending the date of commencement of functions by the first class school district boards established under the provisions of this amendatory act but such provision shall not impair the right of any such board to determine and implement prior to such date such changes in attendance provisions as are mandated by practical necessity. In reviewing, confirming, establishing or modifying attendance provisions the first class school district boards established under the provisions of this amendatory act shall have a policy of open enrollment and shall enable students to attend a school of preference but providing priority acceptance, insofar as practicable, in cases of insufficient school capacity, to those students residing nearest the school and to those students desiring to attend the school for participation in vocationally oriented courses or other specialized curriculum.

Sec. 13. If any portion of this act or the application thereof to any person or circumstance shall be found to be invalid by a court, such validity shall not affect the remaining portions or applications of this act which can be given effect without the invalid portion or application, and to this end this act is declared to be severable.

Section 2. Sections 1, 2 and 3 of Act No. 244 of the Public Acts of 1969, being sections 388.171, 388.172 and 388.173 of the Compiled Laws of 1948, are repealed.

This act is ordered to take immediate effect.