Michelle **OLIVER**, by her Father and Next Friend, et al., Plaintiffs,

v.

**KALAMAZOO BOARD OF EDUCATION**, a body corporate, et al., Defendants.

C. A. No. K–88–71.

United States Distict Court, W. D. Michigan, S. D.

Aug. 25, 1971.

Memorandum Opinion and Modified Preliminary Injunction Oct. 7, 1971.

On Motion for Protective Order July 26, 1972.

768

Howard & Howard, Kalamazoo, Mich., Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Dunnings & Gibson by Stuart J. Dunnings, Jr., Lansing, Mich. (Philip Hummer by Richard Enslen, Kalamazoo, Mich., of counsel), for plaintiffs.

Foster, Lindemer, Swift & Collins by James A. White, Lansing, Mich. (Theodore W. Swift, Lansing, Mich., of counsel), for Kalamazoo City Education Assn. and Michigan Education Assn., as amici curiae.

Ford, Kriekard, Staton & Allen by Arthur Staton, Jr., Gordon H. Kriekard and W. Fred Allen, Jr., Kalamazoo, Mich., Michael H. Jackson, Denver, Colo., for defendant, Kalamazoo Board of Education.

Eugene Krasicky, Asst. Atty. Gen., Lansing, Mich., for Michigan State Board of Education and John W. Porter.

## OPINION OF THE COURT

FOX, Chief Judge.

The jurisdiction of this Court is properly invoked under 28 U.S.C. Sections 1331(a), 1343(3) and (4), this being a suit in equity authorized by Title 42 U.S.C. Sections 1983, 1988 and 2000d.

Jurisdiction is also invoked under 42 U.S.C. § 1981, and further invoked under 28 U.S.C. Sections 2201 and 2202, this being a suit for declaratory judgment seeking to declare the July 6, 1971 resolution of the Kalamazoo, Michigan, Board of Education unconstitutional, and other relief.

On August 12, 1971, this Court entered a Temporary Restraining Order enjoining the defendants, Kalamazoo Board of Education, its agents, employees and other persons acting in concert with them from implementing the voluntary open enrollment plan contained in the July 6th resolution of the Kalamazoo Board of Education, pending further hearing on plaintiffs' application for a preliminary injunction. Plaintiff's application seeks extension of the injunctive order of August 12, direction of implementation of the plan of school desegregation adopted by the Kalamazoo Board in its earlier resolution of May 7, 1971, and an injunction restraining the defendants from further school construction and requiring assignment of school faculty and staff personnel so as to achieve racial balance for the purpose of acquiring equal opportunity for education and quality education.

Having examined numerous documentary exhibits, attendance zone maps, administrative studies, and having heard the testimony of several witnesses over a two-day period, and the oral arguments of counsel, this Court finds the following factual circumstances:

The schools maintained and operated by the Kalamazoo Board of Education are racially segregated. There appears no dispute as to the fact that five elementary schools—Lincoln, Woodward, Edison, Roosevelt, and Northglade —are predominantly populated by black

students, although the population of the Kalamazoo School District as a whole is merely approximately 17.6 [1] percent black. The remaining twenty-four schools are predominantly "white" schools.

Thus we begin this decision confronted with the undisputed fact that Negro black children are being deprived of quality education in the Kalamazoo School System, and that early deprivation of innocent young children culminates in permanent, devastating, irreparable harm—harm incapable of subsequent correction. This is best described by the Brown v. Board of Education opinion of the United States Supreme Court, 347 U.S. 483 commencing on page 492, 74 S.Ct. 686, on page 691, 98 L.Ed. 873:

"In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when Plessy v. Ferguson [163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256] was written."

These are the words of Chief Justice Warren. (Continuing) "We must consider public education in the light of its full development and its present place in American life throughout the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws.

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

"We come then to the question presented: Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does.

"In Sweatt v. Painter, *supra* [339 U. S. 629, 70 S.Ct. 848, 94 L.Ed. 1114], in finding that a segregated law school for Negroes could not provide them equal educational opportunities, this Court relied in large part on 'those qualities which are incapable of objective measurement but which make for greatness in a law school.' In McLaurin v. Oklahoma State Regents, *supra* [339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149], the Court, in requiring that a Negro admitted to a white graduate school be treated like all other students, again resorted to intangible considerations: '. . . his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession.'"

Skipping a little further.

"Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, this finding is amply supported by modern authority. [namely,] . . .

" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development

---

1. According to 1970 school census.

of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system.' "

That is a quote by the Court from a Kansas case.

"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment."

 The officials of the Kalamazoo Board of Education in the school system have, by their actions, admitted that these black children are being given an inferior education, psychologically damaging to their self-image and economically damaging to their ability to perform in an adult world. To a child, segregation "reinforces the idea that he is different, separate and inferior" . . and the cause of that segregation is irrelevant "as it would make no difference whether it be *de jure* or whether it be by circumstance . . . *de facto*", the harm remains. [Davis v. School District of Pontiac, D.C., 309 F.Supp. 734, page 736]

I am discussing now simply as to the effect on the child. I am not engaging in legal terminology. I am not making a precise lawyer-legalistic distinction. I am categorically saying that whether the segregation is de facto or de jure, the impact on each and every individual black child so situated is the same; and this is seventeen years after *Brown.*

On May 7, 1971 the Kalamazoo Board of Education adopted a plan for the redefinition of attendance areas designed to effect substantially increased racial integration. The parties are agreed that this plan, if implemented, would achieve this intended result.

Every school official and every member of the School Board who testified who were members of the Board at the time of the adoption of the May 7, 1971 plan, admitted this fact.

In June of 1971, a School Board election campaign was dominated by outpourings of community resentment of and hostility towards the integration plan promulgated on May 7. As a result of the June 14, 1971 election, two new members were elected to the Board. These individuals had campaigned vigorously on a platform which promised the nullification of the May 7th resolution and the overturning of the integration plan incorporated therein.

At the very first Board meeting following the election, on the motion of Mr. Hoekstra, supported by Dr. Pattison who drafted the resolution, the newly constituted Board passed a resolution which effectuated this promise. In lieu of the structural changes provided under the extinguished plan, the new resolution of July 6th provided for a "Voluntary Open-Enrollment Plan."

As was observed in the most recent Tenth Circuit *Keyes'* case [Keyes v. School District No. 1, 445 F.2d 990] cited by defense counsel in arguments, Judge Hill concluded that the experiences with the voluntary plans were far less than satisfactory.

Evidence of the effect of a voluntary plan may be gathered in part by the fact that up until seven days ago from July 6th forward, the voluntary plan was available and only ten applications were received affecting about 15, I think it was, students.

No further action was taken thereafter because of the restraining order of this Court. Volunteer plans, at best, are incomplete and do not come up to the standards of compulsory plans, especially when the segregation has been so deepseated and long lasting.

Feeling this Board action delaying and stifling the earlier Board effort to integrate the public schools constituted an infringement of their Constitutional rights to equal protection of the laws and due process of law, the plaintiff school

children and their parents brought this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons in the City of Kalamazoo similarly situated. The Kalamazoo Branch of the National Association for the Advancement of Colored People joined in bringing this action.

The Board action of May 7, 1971, was not without extensive prior consideration, study and deliberation. At least as early as May 20, 1968, the Board instructed the school administration to develop a plan for integrating the district's elementary, secondary and junior high schools. The administration committee established to carry out this charge made its report on November 8, 1968. That report opened thusly:

"The Kalamazoo Board of Education, in an attempt to bring about a realization of equal opportunity by deliberate cooperation without regard to racial or other social barriers, propose to do away with segregation and deprivation among students in the Kalamazoo Public Schools."

Now that was on November 8, 1968, nearly three[2] years ago. That same report deliberately defined its exact meaning in this area. It defined "segregation" as "the social system represented by (among other named characteristics) the designation of inferior biological and social status through legal means and the power of the community."

The indication that de jure segregation which deprived students of their constitutional right to equal educational opportunity existed in Kalamazoo was subsequently emphasized and elaborated by this administration committee in that section of its report entitled "Rationale for Integration." Therein the committee expressly stated that legal considerations were central to the Kalamazoo integration effort. Extensive reference was made to the landmark decision of the United States Supreme Court in Brown v. Topeka Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, as well as to a very significant joint statement of the Michigan State Board of Education and the Michigan Civil Rights Commission which is discussed in detail herein below.

On November 6, 1968, another committee was charged by the Kalamazoo Board of Education to study the problem of racial segregation in the schools and to make recommendations regarding a suitable integration plan. Thereupon, according to the testimony of Mr. Donald C. Smith, its chairman, the Citizen's Racial Balance Committee entertained thorough consideration and study of several possible plans for achieving racial integration. Among the alternatives investigated were:

One. Pairing of "white" and "black" schools within enlarged attendance areas.

Two. Establishment of some kind of Educational Center which would service in a scheduled manner schools located around its perimeter.

Three. Development of a single giant school complex, along the lines utilized in Evanston, Illinois, which would draw upon the entire school district.

Four. Conversion of present school facilities to allow individual schools to provide an educational program for only a single grade.

And, five. One-way busing of black children to "white" schools.

Also considered by the Citizen's Committee was an open-enrollment type of voluntary plan. Mr. Smith explains that while at first the members of the committee were very favorably impressed with this concept, upon further investigation they discovered that such plans have been found in other communities to be wholly unfeasible and impractical solutions to the problem of racial integration.

2. However, as early as 1962, according to the testimony of Mr. Smith, beginning with the 1962 Citizens' Report, conclusions of the Superintendent and his staff, the Board was preparing for its ultimate action of May 7, 1971.

On August 18, 1969, the Citizen's Racial Balance Committee tendered its findings and recommendations to the Board. The Committee found that over 90 percent of all black elementary students were housed in the five elementary schools located on the north side of town and that 95.5 percent of all black junior high students attended three of the five junior high schools.

The Committee report further stated:

"These figures illustrate the serious extent to which racial segregation exists in the Kalamazoo school district. Racial isolation has had a serious effect on the achievement of the students thus isolated; the predominantly black attended schools achieve at a level two grades below national norms in grade six. Compared to the top achieving schools in our city, they are four grades below."

Identifying both moral and legal grounds for moving quickly to correct this stark inequitable condition of educational deprivation, and respecting, too, the need to move reasonably and thoroughly, the Citizen's Committee recommended a three-phase program for implementing improved educational opportunity and quality through racial integration.

Phase One was to absorb the time from September 1969 to September 1970. During this time it was advised that increased black faculty and staff be recruited, in-service training of present personnel be implemented to help them understand and relate to minority students, curricula be reviewed with an eye to relevance to the needs of black students, and efforts be initiated to educate the community as to the conditions and implications of racial imbalance in the schools and the need to correct it.

Phase Two was recommended to overlap Phase One and to extend to September of 1971. This phase of the program called for exchange visits of students and teachers between currently existing black and white PTA groups. Also to be sought during this preparatory period were "imaginative suggestions to ease tensions" so as to prepare the community for implementation of the integration plan embodied in Phase Three.

Against the background of this careful and methodical preparation, the Committee recommended the final effectuation of concrete desegregation efforts in September 1971, based on a plan whereby neighborhood attendance areas would be enlarged and existing elementary schools would be designed to service either grades K–1, 2, 3, or grades K–4, 5, 6. Specific formulation of attendance zone boundaries was recommended to be made in conjunction with a freely available computer program established for such purposes at the Illinois Institute of Technology. The earlier-formed administration committee fully concurred in these recommendations.

Mr. Smith testified that this recommendation for racial balancing was considered by himself and the Committee as a whole a "necessary first step" in achieving quality education by way of finally providing equal educational opportunity.

It wasn't racial balancing for balancing of races primarily. It was only a first step to accomplish the ultimate desired end.

In September of 1969, within a month of the submission of the above-summarized report, the School Board adopted and implemented Phases One and Two of that report.

I might add also that there were letters which evidenced that the report had been submitted for consideration and comment by many educators across the country and by public officials, including the Secretary of Housing, George Romney, and President Miller of Western Michigan University. Their advice was sought, their comment was sought, and all of them responded in the affirmative that it was a good report. Many of its recommendations were incorporated in the May 7th plan.

In May of 1971, the Citizen's Racial Balance Committee reconvened and consulted with regard to the Illinois Insti-

tute of Technology computer arrangements. Throughout 1970, individual members of the Committee urged the Board to follow through with the scheduled ultimate realization of the integration plan.

Nevertheless, at its January 1971 meeting, the Board announced its intention to integrate only the high schools in September of 1972. No plans were announced with regard to the elementary schools.

At the urging of several community leaders, however, the Board resolved in April 1971 to investigate the possibility of implementing a comprehensive plan along the lines of Phase Three in September of 1971.

Dr. John Cochran, Superintendent of Kalamazoo Schools, then set about the task of readying a specific detailed proposal for Board consideration in May. The computers of the Illinois Institute of Technology were put to work and a plan devised. That plan was duly accepted and adopted by the Board on May 7, 1971, amid great public debate. It is worthy of note that the plan as adopted was endorsed by both the Kalamazoo City Education Association and the Kalamazoo Association of School Administrators.

After the action of the Board on May 7, Dr. Cochran directed extensive efforts towards readying the district mechanically to make the necessary changes. The administration gathered the names of all students, mailed to them information about the new attendance plan, prepared for the necessary staff and teacher transfers, packed library and other equipment and materials for shipment to new locations, instituted open houses to acquaint students with their prospective new surroundings, contacted parent groups to encourage the welcoming of new members, and planned dry run exercises for those who would be bused for the first time under the new plan. Newspapers ran illustrations of the new attendance zone maps, while administrators and civic leaders appeared before community groups and organizations to prepare citizens for the new plan.

These preparations were frozen upon the election of the new Board members in June.

The new Board members and defense counsel have contended and attempted to demonstrate to this Court that the action of the School Board in drafting and promulgating the May 7th plan was precipitous.

■ This Court finds, as a matter of fact and law, that it was not precipitous; that it was a very careful, deliberate, fully-considered plan by conscientious, sincere, publicly dedicated, self-sacrificing men who had the courage to "bite the bullet."

On July 6th, the new membership of the Board, reflecting outspoken community hostility to the integration plan, reinstated the old boundary lines and their attendant racially segregated schools.

Dr. Cochran, the Superintendent of Schools, on July 9th was pressured by the new Board into resigning his position as Superintendent, and I find that that pressure was a result of the activities of Dr. Cochran in promulgating and preparing and attempting to execute this carefully considered plan of integration.

Both Dr. Cochran and Mr. Reed Hagen, the newly appointed present Superintendent of the Kalamazoo Schools, have testified that the May 7th plan can still be practicably implemented by the opening of this present school year.[3]

---

3. The court notes that Dr. Cochran, former Superintendent of Schools, was pressured into resigning his position because of his part in the preparation and attempted execution of the May 7th plan. This firing sent a chill through the personnel of the entire school system—it was a clear message. This chilling effect was evidenced in the testimony of school system employees, particularly that of Lutz. The court believes that the 44 bus requirement testified to by Lutz is an absolute maximum and notes, again, the testimony of both the present and past Superintendents

There has been submitted evidence in this case as to the economic costs prospectively entailed in the implementation of the May 7th plan.

The Court finds that a great bulk of these costs is attributable to the failure of administrative personnel to assume responsibilities for preparing matters within their respective areas of competence.

This Court also finds that the raising or lowering of blackboards and drinking fountains, the painting of walls and other such environmental refinements are not matters of exigency which require the delay of desegregation efforts.

This Court further finds that evidence regarding the availability of buses for the implementation of the May 7th plan does not establish the practicable impossibility of realization of that attendance zone plan.

The testimony of the two Superintendents that the May 7th plan could be implemented by the beginning of the school year is bolstered by additional evidence that federal funds will become immediately available upon the implementation of this plan.

There was testimony to the effect that the budget was very lean and there was no provision in the budget to provide for it [the May 7th plan], therefore it should not be executed, that it would result in a deficit. There is testimony to the effect that within the last two years or so the School Board was called upon to meet a non-budgeted emergency situation when the State Supreme Court decided that, as a matter of law, the students were entitled to free textbooks and, likewise, free lunches. And, in addition, there is testimony from the present Superintendent of Schools that at that time, coextensive with these unbudgeted demands, the School Board was denied $250,000 by reason of a cut in school aid from the State. None of these problems are insurmountable. None of them. All of them are attainable.

This aid fund is available under the Federal Emergency Desegregation Act, of which this Court takes judicial notice. This May 7th plan can be financed if ordered by the Court.

As to the above statement of facts, there can be no significant dispute. The defendant School Board appears to concede, as indeed the relevant statistics indicate they must, that the Kalamazoo Public Schools are "racially unbalanced" and racially identifiable, and that within the ordinary understanding of citizens of the community there are black schools and there are white schools in Kalamazoo. In addition, defendants have made no real effort to deny, nor does this Court believe they could successfully deny, that as a result of this segregated condition of the schools, black school children are educationally deprived, intellectually stifled, and academically and

of Schools that the May 7th plan can still be implemented by the opening of this school year. Lutz himself admitted this in his testimony that busing under the May 7th plan is still within the realm of possibility.

Both Superintendents, past and present, are experienced in busing school children and have engaged in busing for the last five years. Last year approximately 6000 students were bused—2900 by the Kalamazoo school system and 3100 by the City. Therefore, when these men conclude that busing can be accomplished by September 7, such conclusions are entitled to substantial credibility. Implicit is their knowledge of scheduling and multiple runs.

In addition, Clayton L. Richardson, manager of Metro Transit, the city bus system, on cross-examination, testified that the City bus system was operating under capacity, that the capacity per bus was 45, and that the per-bus run was approximately 15 passengers.

He further testified that he was in pursuit of additional passenger traffic from the school system. He also testified that Kalamazoo has been selected for a federally funded mass transit program and was destined to obtain a substantial increase in passenger transportation facilities.

psychologically uninspired. The gaping disparity of achievement levels between black and white schools cannot be rationalized without reference to the factor of racial isolation. Indeed, it was precisely because of the recognition of these detrimental effects on the quality education of minority groups students that the Kalamazoo Board rightly proceeded on a course of desegregation over four years ago.

Moreover, the United States in Brown recognized and ruled some seventeen years ago that segregated education is unequal education, that "segregation of white and colored children in public schools has a detrimental effect upon the colored children."

In further recognition of this seemingly self-evident principle, the State Board of Education of Michigan and the Michigan Civil Rights Commission have declared the following policy:

"Joint Policy Statement of the State Board of Education and Michigan Civil Rights Commission on Equality of Education Opportunity.

"In the field of public education, Michigan's Constitution and laws guarantee every citizen the right to equal educational opportunities without discrimination because of race, religion, color or national origin. Two departments of state government share responsibility for upholding this guarantee. The State Board of Education has a constitutional charge to provide leadership and general supervision over all public education, while the Michigan Civil Rights Commission is charged with securing and protecting the civil right to education.

"In addition to the declaration of public policy at the State level, the United States Supreme Court, in the case of Brown vs. Board of Education, ruled: 'that in the field of public education the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal.'

"The State Board of Education and the Michigan Civil Rights Commission hold that segregation of students in educational programs seriously interferes with the achievement of the equal opportunity guarantees of this state and that segregated schools fail to provide maximum opportunity for the full development of human resources in a democratic society.

"The State Board of Education and the Civil Rights Commission jointly pledge themselves to the full use of their powers in working for the complete elimination of existing racial segregation and discrimination in Michigan's public schools. It shall be the declared policy of the State Board of Education that in programs administered, supervised, or controlled by the Department of Education, every effort shall be made to prevent and to eliminate segregation of children and staff on account of race or color.

"While recognizing that racial imbalance in Michigan schools is closely related to residential segregation patterns, the State Board of Education and the Civil Rights Commission propose that creative efforts by individual school districts are essential and can do much to reduce or eliminate segregation. Local school boards must consider the factor of racial balance along with other educational considerations in making decisions about selection of new school sites, expansion of present facilities, reorganization of school attendance districts, and the transfer of pupils from overcrowded facilities. Each of these situations presents an opportunity for integration.

"The State Board of Education and the Civil Rights Commission emphasize also the importance of democratic personnel practices in achieving integration. This requires making affirmative efforts to attract members of minority groups. Staff integration is a necessary objective to be considered by administrators in recruiting, assigning, and promoting personnel. Fair employment practices are not only required by law; they are educationally sound.

"The State Board of Education and the Civil Rights Commission further

urge local school districts to select instructional materials which encourage respect for diversity of social experience through text and illustrations and reflect the contributions of minority group members to our history and culture. A number of criteria are enumerated in 'Guidelines for the Selection of Human Relations Content in Textbooks,' published by the Michigan Department of Education.

"The State Board of Education and the Civil Rights Commission believe that data must be collected periodically to show the racial composition of student bodies and personnel in all public schools, as a base line against which future progress can be measured. Both agencies will begin next month to assemble information on the present situation.

"To implement these policies the State Board of Education has assigned staff of the Department of Education to work cooperatively with the Civil Rights Commission and local school authorities for the purpose of achieving integration at all levels of school activity. The Michigan Civil Rights Commission also stands ready to assist local school boards in defining problem areas and moving affirmatively to achieve quality integrated education.

"Adopted and signed this twenty-third Day of April, 1966," and it is signed by all of the members of the State Board of Education and the Michigan Civil Rights Commission. The Chairman of the Civil Rights Commission at that time was The Honorable John Feikens, who is presently a United States District Court Judge in the Eastern District of Michigan.

The 1963 Constitution of the State of Michigan provides as follows:

"ARTICLE VIII. Education.

"Encouragement of education. Section 1. Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.

"Free public elementary and secondary schools; discrimination. Section 2. The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. *Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin.*

"State Board of Education; duties. Section 3. *Leadership and general supervision over all public education,* including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, *is vested in a state board of education. It shall serve as the general planning and coordinating body for all public education,* including higher education, and shall advise the legislature as to the financial requirements in connection therewith." [Emphasis added]

In addition, Article V, Section 29, of the 1963 Constitution of the State of Michigan, provides as follows:

"Civil rights commission; members, term, duties, appropriation. Sec. 29. There is hereby established a civil rights commission which shall consist of eight persons, not more than four of whom shall be members of the same political party, who shall be appointed by the governor, by and with the advice and consent of the senate, for four-year terms not more than two of which shall expire in the same year. *It shall be the duty of the commission in a manner which may be prescribed by law to investigate alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by law and by this constitution, and to secure the equal protection of such civil rights without such discrimination.*"

The above joint statement of the Michigan State Board of Education and the Michigan Civil Rights Commission was adopted and implemented pursuant to the above constitutional provisions.

The above joint statement, that was the joint policy between the State Board of Education and Michigan Civil Rights Commission. They acted under the authority vested in them by the constitution of the people of the State of Michigan.

█ This Court finds as a matter of fact and law that the Kalamazoo School Board in facing up to the problems incident to the segregated conditions, acted in accord with and pursuant to the above-stated policy and directive of the Michigan State Board of Education and the Michigan Civil Rights Commission; and the Michigan State Board of Education does have the superintending control over the local boards of education.

And I find as a matter of fact and law that the opinion of Attorney Ford, when asked by the School Board whether it would be proper for it to seek guarantees from a builder that its project not enhance or add to racial segregation, was incorrect in his advice that the Board had no authority to act and that the Kalamazoo Board could disregard the State School Board's mandate. This is not the law.

The law in the State of Michigan vests in the State Board of Education superintending control over all education, elementary and secondary.

This is a very important distinguishing factor from the *Deal* decision, infra. We have two distinguishing factors, at least. One is that you have a board of education acting voluntarily. But, that probably wasn't completely voluntarily because, in a sense, it was also in response to the mandate of the State Board of Education acting jointly with the Michigan Civil Service Commission. And I find that the Board did adopt and establish a completely well-considered, deliberately considered, thoroughly considered plan of integration.

However, having in mind the directives of the Michigan State Board of Education, as elicited upon cross-examination from the testimony of Mr. Maynard C. Morgan, the facts have been established that the four elementary schools most recently situated and constructed by the Kalamazoo Board were established without any long view to improving racial balance in the schools, and contrary to the directive of the Michigan State Board of Education.

Northglade School was built by the Board in 1960. That was before the directive, but it was without a long view to improving racial balance in the schools. Northglade is a neighborhood school, and it was built in 1960, which was then racially mixed at that time but obviously in a state of transition racially. This was a flag to the Board, something had to be done about it.

Within less than eight years, that school was clearly black. It has been identified in court frequently as one of the five black elementary schools in Kalamazoo.

In 1959, two elementary schools, Winchell and Indian Prairie, were built in white areas with no view to improving the problem of racial segregation or directing the flow of students so as to reduce segregation.

These schools have consistently maintained a homogeneous white student body. The same is true of the Board's most recent construction effort, Arcadia School.

█ In each of the above instances, this Court finds that the Kalamazoo Board of Education failed to seize the opportunities it confronted and act affirmatively to relieve conditions of racial imbalance and the deprivation of educational opportunity which all agree has resulted therefrom. [*See* Davis v. School District of Pontiac, 309 F.Supp. pp. 740–742]

There are other instances and strong indications in the present record of further such circumstances. These are largely reserved for a full hearing on the merits of this case, in accordance with the stipulation of counsel and the order of this Court.

In this regard, Swann v. Charlotte-Mecklenburg Board of Education 402

U.S. 1, at 18, 91 S.Ct. 1267, at 1277, 28 L.Ed.2d 554 teaches:

"In *Green,* we pointed out that existing policy and practice with regard to faculty, staff, transportation, extracurricular activities, and facilities were among the most important indicia of a segregated system. [Green v. County School Board] 391 U.S. 430, at 435 [, 88 S.Ct. 1689, at 1692, 20 L.Ed.2d 716]. Independent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown.

"When a system has been dual in these respects, the first remedial responsibility of school authorities is to eliminate invidious racial distinctions."

As Judge Damond Keith observed in the Davis v. School District of Pontiac, 309 F.Supp. Page 741:

"When the power to act is available, failure to take the necessary steps so as to negate or alleviate a situation which is harmful is as wrong as is the taking of affirmative steps to advance that situation. Sins of omission can be as serious as sins of commission."

■ Where a Board of Education has contributed and played a major role by reason of planning school locations and constructions which substantially contribute to the growth of a segregated situation, the Board is guilty of de jure segregation. "The fact that such came slowly and surreptitiously rather than by legislative pronouncement makes the situation no less evil." As I observed before, the net result of the total segregated situation in the school or the substantial segregated situation in the school is the same on the child, no matter what tag we attempt by legal reasoning to hang onto the situation.

And the loss and damage to the community and these United States from the continued accumulation of damage, unremitting damage to an important segment of our citizens cannot be justified by any standard whatsoever, just the sheer loss of the ability of having good citizens, responsible citizens.

Now, against the background of all this seasoned, reasonable, documented social and educational theory, and the fact of racial separation and isolation in its own schools, the Kalamazoo presently duly elected Board members' response is: "We have a rationale, a reason not to act to correct this universally condemned educational environment; we have a legal out which exonerates us from legal responsibility in this area, namely, the claimed absence of state action which is a prerequisite to the relief predicated on the Fourteenth Amendment." The record in this case is clearly contrary.

Defendant's argument rests on the opinion of the Sixth Circuit Court of Appeals in the case of Deal v. Cincinnati Board of Education, 369 F.2d 55. In that case the Court held that where there exists a situation of racial imbalance attributable entirely to residential patterns and not caused or perpetuated in any way by actions of the School Board, then the Board cannot be forced to implement a plan of integration.

In our case, of course, plaintiffs contend that the Board of Education is not so innocent of past discriminatory practices as to qualify under the factual premises of *Deal.* This complicated factual issue could not be adequately considered in the present exigent circumstances of a hearing on the question of a preliminary injunction in view of the immediate history in this case and the present pendency of the new school year and of the clear intent of a duly consituted Board to have the beginning of the implementation of desegregation at the beginning of this school year in September.

Hence, the Court is not in a position to rule on whether or not the Board had a constitutional duty to adopt the plan of May 7, 1971 at that time from a con-

sideration of all of the evidence, because all of the evidence isn't in.

But, there appears to be substantial evidence in support of a finding of de jure segregation in this case.

 Boards of Education · cannot absolve themselves from responsibility for situations, such as I have described, when it had the power and the duty and control to prevent the situation. "It would be feigned modesty on the part of any Board of Education to suggest that it is controlled by a situation . . ." that it cannot control. [See *Davis, supra*] A decision regarding the location of new schools is one for the Board, as the evidence in this case and as the law of this State clearly demonstrates. It is for no one else to make that decision, but the School Board.

And, likewise, for a school board to acquiesce, even by inaction, in a housing development pattern, and then to disclaim liability for the eventual characteristic that such pattern created in the schools is for the Board to abrogate and ignore all power and control and responsibility. And the Boards are clothed with very substantial power, even the power to tax, in some instances; and with such authority vested in them, and such power in a community, a school board has tremendous influence upon the community and can influence the community very substantially, and does, across the country.

This Court can further observe that in May of 1971, and, in fact, since April of 1966, the Board did have a duty under Article VIII, Section 3, of the Michigan Constitution of 1963 to obey the directives of the State School Board of Education quoted above.

It is also clear that prior to the adoption of the May 7th integration plan, both the State Board of Education and the local Board saw a federal constitutional obligation to take positive steps to disestablish the segregated system existing in Kalamazoo. Since these bodies were necessarily privy to the facts and data not yet available to this Court on this question, and since this question was one which was and is central to the matters of quality education within the responsibility of these bodies, their determinations and judgments must be respected by this Court.

Further, and more significantly, the posture of this action makes it clearly distinguishable from that considered by the Court in *Deal*. Here, a duly constituted Board, after much deliberation and under the mandate and instruction of the State Board of Education, did in fact take affirmative action. That was absent from *Deal*.

 Leaving aside for a moment the question of whether or not the Board was under a duty to adopt that plan, the fact is that they did adopt a plan designed effectively to integrate the public schools and to at least begin to correct what it, upon careful consideration, saw to be the kind of deprivation and unconstitutional inequality censured in *Brown*. Cast in this context, the action of the newly elected Board on July 6, insofar as it served to delay and impede or obstruct the lawful implementation of the integrated plan of May 7th, was unconstitutional.

This Court finds that the posture of the present action is much more closely analogous to that presented to the Sixth Circuit in Bradley v. Milliken, 433 F.2d 897 (1970) than it is to that presented in *Deal*. In *Bradley*, the Detroit Board of Education passed an integration plan which the State Legislature attempted to rescind. Defendant's own brief concedes at page 15 that in *Bradley* "the action of the Board of Education was within the discretionary power of the Board."

In *Bradley*, the Court held that the attempt by the State to rescind the prior Board attempt to integrate was unconstitutional. This ruling was made, as *Bradley* again teaches us, without deciding the question of "the merits of the plan" of the Board "or as to whether it was the constitutional obligation of the School Board to adopt all or any part of that plan."

The Court expressly distinguished *Deal* precisely on the ground that *Deal* did not pose the circumstances of affirmative Board action. Quoting from *Bradley:*

"In the present case the Detroit Board of Education in the exercise of its discretion took affirmative steps on its own initiative to effect an improved racial balance . . . . " At page 904 of the Bradley case.

■ In this context, then, the Sixth Circuit teaches us that any attempt by an arm of the state government to impede an effort by a duly constituted school board to protect constitutional rights is itself state action which denies[4] equal protection of the laws, or, more specifically, denies equal educational opportunity and quality education to black students in the black schools of Kalamazoo.

The *Bradley* ruling is quite specific:

"State action cannot be interposed to delay, obstruct or nullify steps lawfully taken for the purpose of protecting rights guaranteed by the Fourteenth Amendment." Page 903.

■ The steps of the School Board on May 7, 1971, were steps lawfully taken for the purpose of protecting rights guaranteed by the Fourteenth Amendment, and, therefore, the newly constituted Board is without Constitutional power to set aside that clear action designed to protect Fourteenth Amendment rights.

The July 6th resolution of the Kalamazoo Board of Education was such obstructive state action, reflecting, in circumstances remarkably similar to those in Bradley, popular expressions of community hostility channeled through school board elections.

■ The principle is deeply embedded in the very fabric of this Republic that constitutionally secured rights are not subject to popular referendum.

"The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." West Virginia State Board of Education v. Barnette, 319 U.S. 624, at 638, 63 S.Ct. 1178, at 1185, 87 L.Ed. 1628.

The very role and defining purpose of the original Bill of Rights and all subsequently promulgated constitutional rights is that they are rights inherent to the preservation of man's dignity and

---

4. The Fourteenth Amendment reads in relevant part as follows: "No State shall . . . ; nor *deny* to any person within its jurisdiction the equal protection of the laws." (Emphasis supplied.)
Webster's New Collegiate Dictionary defines "deny" as follows:
de·ny' (dē·nī'), *v.t.;* DE·NIED' (-nīd'); DE·NY'ING. [OF. *denier, deneier,* fr. L. *denegare,* fr. *de+negare* to deny.] 1. To declare not to be true; contradict. 2. To refuse to grant, gratify, or yield to; as, to *deny* a request. 3. To disclaim connection with or responsibility for; to disavow. 4. *Archaic.* To refuse (to do, or accept, something); decline. 5. To refuse access to (one called on); to represent as "not at home"; as, she *denied* herself to callers. 6. To reject as a false conception; as, to *deny* man's free will.

*deny oneself.* To practice self-denial.
Syn. Deny, gainsay, contradict, negative, traverse, impugn, contravene mean to declare untrue or to go counter to the truth. Deny commonly implies a refusal to accept a statement as true; gainsay implies a disputing the truth of what has been said or the integrity of the person saying it; contradict implies an open or flat denial by suggesting the statement's (or the speaker's, etc.) running counter to the truth; negative, a milder term, implies refusal to assent; traverse, chiefly a legal term, implies a formal denial of truth; impugn stresses an attack upon the truth of a statement or of a person making it; contravene stresses a running into conflict between what has been said or taught (and, in law, done) and things as they are.—Ant. Concede.

liberty, so sacred as to be secured beyond the reach of the day-to-day vicissitudes of public opinion.

This nation is surely a democracy, but it is also more. It is a *Constitutional* democracy which hallows these basic rights which define a free people.

■ The right to equal educational opportunity, regardless of race, creed or color, is included in those sacred rights. No state or popular effort to frustrate the fulfillment of that right can be allowed to stand.

It is therefore ordered that the resolution of the Kalamazoo Board of Education of July 6, 1971, delaying, impeding and halting for one year the implementation of the plan of integration, and establishing instead a voluntary "open enrollment plan" of school attendance is unconstitutional and is therefore void. The Board of Education, its agents and other persons acting in concert with them are hereby enjoined and restrained from giving any force or effect to said resolution.

It is further ordered that the school attendance plan promulgated by the Kalamazoo Board of Education on May 7, pursuant to the April 23, 1966 directive of the State Board of Education and the Michigan Civil Rights Commission, be implemented immediately, thereby restoring the rights of plaintiffs and members of their class to their status prior to the adoption of the July 6, 1971 resolution, and preserving same until a full hearing on the merits, or further order of this Court.

It is further ordered that the Kalamazoo Board of Education fully and immediately carry out the implementation of the May 7 resolution, that it become completely and fully effective at the beginning of the September, 1971–1972 school year. The Board of Education is also enjoined to carry out the order of this Court in good faith and to implement the various subsidiary aspects of the May 7 resolution. Further, there shall be no precipitious firing of employees as a result of their attempting to carry out the order of this Court or carry into operation the plan of desegregation.

It is so ordered.

### Memorandum Opinion and Modified Preliminary Injunction

On May 7, 1971, the defendant Kalamazoo Board of Education, after more than three years of preparation and study, directed the implementation of a program of redefinition of school attendance zone boundaries so as to effect desegregation of the Kalamazoo Public Schools. This action consummated the final stage of a comprehensive plan designed to mitigate and ultimately remedy unequal educational opportunities being provided in the Kalamazoo system to black and white children.

On July 6, 1971, following a heated school board election, a newly constituted board reflected widespread community hostility to the desegregation plan and moved to suspend it. This court, by its preliminary injunctive order of August 20, 1971, avoided the July 6 effort to "turn back the pages" and reimpose segregated conditions as unconstitutional and enjoined interference with what has been designated the "May 7 Plan," reserving jurisdiction to make whatever further modifications in its order that might become necessary.

On August 30, 1971, the same day that the Sixth Circuit Court of Appeals, 448 F.2d 635 affirmed the order of this court, the Kalamazoo electorate again rejected a school board millage request. Responding to the financial pressures imposed by the millage defeat, the defendant school board voted to curtail several school programs and services and to terminate the employment of all teaching personnel on probationary status. Some 103 teachers and counselors received "pink slips" pursuant to this board action, indicating that they would be dismissed following the completion of the October 1 school day. In addition, 35.5 school library assistants were pink-slipped. Of the 103 teachers and counselors affected, 26 are black. Should

these teachers leave the Kalamazoo system, the black population of the teaching staff would be cut in half, from 8% to roughly 4%.

Petitioners here challenge the Board effort to dismiss the nontenure teachers. They claim that such action is economically unnecessary, would emasculate the desegregation program in the Kalamazoo schools and would irreparably regress Kalamazoo educational opportunities to a condition of inequality, in direct contravention of this court's earlier order.

The defendant school board replies that this court has no jurisdiction to entertain plaintiffs' petition since the earlier order which is the basis of asserted jurisdiction was directed only to the comingling of students and did not relate to the teaching staff. Defendants further argue that even should jurisdiction be assumed, the challenged action of the school board was a reflection of a judgment of policy, legislative in nature, and therefore within the exclusive power of the school board to implement.

Stressed from the very beginning of the proceedings in this matter has been the crucial role in the Kalamazoo desegregation effort of a substantial increase in minority group teachers and counselors. Well before the previous school board directed the integration of student bodies, it commenced an active, expensive and very difficult recruitment program in an effort to fill this key need.

This court made the finding in its earlier opinion that the previous school board recognized a startling paucity of black staff in September of 1969 and directed the hiring of more black teachers as a part of its implementation of Phase I of the three-phase desegregation program outlined in the August opinion of this court.

It was recognized by the Citizen's Racial Balance Committee and the school board in 1969, and by this court in its earlier ruling, that an able and substantially integrated faculty and staff was and is an indispensable prerequisite to meaningful integrated education, and essential to an uprooting of the vestiges of segregation.

It has surely been self-evident throughout these proceedings that the mere intermingling of black and white children is not an end in itself. Equal educational opportunity is and always has been the Constitutional objective of this and every court dealing with Fourteenth Amendment rights school cases. While busing may be a necessary tool to attain this objective, a racially sensitive and integrated teaching staff is fundamental.

To belabor the obvious clarity of this principle, it may be observed that the plaintiffs, in the original proceedings, requested the court to order that the teaching staff not be assigned to schools within the Kalamazoo system in a racially unbalanced manner. Since such relief was not shown by the evidence to be necessary then, it was not granted. However, the power of the court to grant such relief upon a proper showing of infringement of constitutionally protected rights in teacher assignment practices cannot be successfully questioned. It surely must follow, as day does night, that if a school district can be ordered to "cease and desist" from constitutionally impermissible unbalanced distributions of teachers throughout the system, it can be ordered to "cease and desist" from blanketly dismissing a substantial proportion of the black teachers, upon a proper showing of an invasion of constitutionally secured rights. Plaintiffs' complaint and the evidence establish defendant school board's action in discharging teachers in the name of a financial crisis is state action, which is constitutionally impermissible because of its invasion of rights secured by the Fourteenth Amendment.

This court has jurisdiction and authority to grant relief in this case.

In the Sixth Circuit's order affirming the preliminary injunction issued in this case, the Court stated:

"The District Judge is authorized to make such modifications in the plan

implemented by the interlocutory injunction as he may find to be appropriate." Citing Davis v. School District of Pontiac, 443 F.2d 573, at 577.

The Davis case involved a similar authorization to the District Judge. There, the Sixth Circuit said:

"The court may, in its discretion, allow the parties to submit alternative plans or propose amendments to the adopted plan, or may consider such other relief as may be appropriate." Citing Swann v. Charlotte-Mecklenburg, 402 U.S. 1, 91 S.Ct. 1267, 28 L. Ed.2d 554.

The Swann case dealt, in part, with the scope of the powers of federal courts to accomplish desegregation. That portion of the Swann opinion footnoted by the Sixth Circuit reads as follows:

"The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation. Segregation was the evil struck down by *Brown I* as contrary to the equal protection guarantees of the Constitution. That was the violation sought to be corrected by the remedial measures of *Brown II*. That was the basis for the holding in *Green* that school authorities are 'clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.' 391 U.S., at 437–438 [, 88 S.Ct., at 1694].

"If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." 402 U.S., at 15, 91 S.Ct., at 1275, 1276.

In February 1803, Chief Justice John Marshall, one of the greatest Chief Justices in our nation's history, in the case of Marbury v. Madison, 5 U.S. 137, 176 (1 Cranch. 137–176), 2 L.Ed. 60, taught all of us:

"The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed, are of equal obligation. It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or that the legislature may alter the constitution by an ordinary act.

\* \* \* \* \* \*

"Certainly, all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently, the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void. This theory is essentially attached to a written constitution, and is, consequently, to be considered, by this court, as one of the fundamental principles of our society.

\* \* \* \* \* \*

"It is, emphatically, the province and duty of the judicial department, to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each. So, if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case, conformable to the law, disregarding the constitution; or conformable to the constitution, disregarding the law; the court must determine which of

these conflicting rules governs the case: *this is of the very essence of judicial duty.* If then, the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature, the constitution, and not such ordinary act, must govern the case to which they both apply.

"Those, then, who controvert the principle, that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law. This doctrine would subvert the very foundation of all written constitutions." (Emphasis supplied.)

The actions drawn in issue in plaintiffs' petitions are the actions of a quasi-administrative legislative body. This court in reaching its decision *is in the discharge of the very essence of its judicial duty.*

Upon a full two-day evidentiary hearing on this matter, the following facts have emerged from the testimony of numerous Kalamazoo teachers, principals, administrators and financial experts. Financially, the school board stands to save some approximately $864,000 by dismissing the teachers. Specifically, the board will save $5,600 for every day the teachers are gone. Among other expenditures presently budgeted for the remainder of the 1971–1972 school year by the board is roughly $600,000 allocated to the operation of the Kalamazoo Public Library which is wholly financed through the school system.

The previously mentioned recruitment effort which brought the presently imperiled teachers to Kalamazoo was a massive and expensive one. Over twenty recruiting trips to southern colleges and universities were sponsored by the school board. The efforts of school personnel, Western Michigan University educators and recruiters, interested private parties and personnel from the local Upjohn

Company were aggregated and coordinated. Even this great effort met with only limited success. The objective was to attain a black staff proportionate in numbers, roughly, to the proportion of black students—17%. Unfortunately, diligent efforts were only able to generate a staff roughly 8% black. Witnesses have testified that from two to fifteen years would be required just to recoup the loss of these teachers should the dismissals be implemented. Competition for black teachers between prospective employers, school systems and private enterprise, is very keen. Teacher applicants are able to carefully evaluate factors of environment, job stability, and financial incentives. The firing of freshly recruited black teachers can only damage the reputation of the Kalamazoo system amongst potential recruits. The dismissals may well also result in the permanent loss of the discharged teachers to other school systems or private industry. These new recruits are to receive the brunt of the school board's dismissal action, since they are, in large numbers, without sufficient seniority to have attained sanctified tenure status.

The loss of these teachers to the Kalamazoo system will have, as indicated by the vast weight of the evidence presented to this court, a devastating effect on the desegregation program originally implemented by the previous school board and enforced by this court's order. The unanimous opinion of all who testified was that these dismissals would literally "tear the heart out of the desegregation plan." These opinions were well supported by cogent explanatory analysis.

The evidence vividly elucidated the utility of black teachers, by simple virtue of their blackness, as role models for black children accustomed to feeling that their own blackness makes them inferior people. The evidence further showed how the presence of black and white staff members sensitive to problems of communication between the races helps to free children's minds to learning by increasing their faith and confidence in

the school as an institution and by diminishing the likelihood of racial tensions fostered by lack of understanding.

The impact of significant numbers of black teachers on the capability and understanding of fellow white teachers is also a vital integral aspect of the relevance of an integrated faculty to the provision of equal educational opportunities. The fact that parent attitudes and confidences are necessarily broadened and improved, so essential to harmony, is also a relevant element in the total educational picture. The peculiar need of disadvantaged children for the assistance of library facilities is likewise central to adequate provision of equal educational opportunities.

Finally, the record establishes that the white teachers and counselors have been recruited as individuals who possess a high degree of sensitivity to the concerns and needs of a heterogeneous student population. The loss of such personnel would similarly jeopardize the Fourteenth Amendment secured rights of the plaintiffs in this action.

The board of education of any school district has the power as a duly constituted legislative body to formulate policy in the management of the school system charged to its responsibility. Judgments as to fiscal policy are authorized under this power. However, these judgments are subject to the review of the courts when they are found to infringe constitutional rights. Whenever a school board is faced with two alternative courses of action, one of which will necessarily impinge upon the provision of Fourteenth Amendment equal educational opportunities to *all* children within the school district and the other of which will not, the board is not free to pursue the former course. Any attempt by it to do so can and should be stricken by the courts.

The evidence strongly indicates that when the board made the decision to fire the teachers and thereby, in effect, sabotage the integration effort, in lieu of closing down the library, the members of the board did not even consider the effect of their decision on the constitutional rights of the students as construed by the courts. Such a condition further minimizes this court's deference to the decision of the board.

It is very clear that presently funds are available from the library budget to maintain the 103 teachers and 35.5 school library workers in the Kalamazoo school system at least through the first semester of this school year. In addition, some $100,000 have been provided by way of private gift for the purpose of helping retain black teachers. To effectuate this gift, it is necessary for the Kalamazoo City Education Association and the school administrative authorities to negotiate acceptance of the racial condition.

The State Board of Education and Dr. John W. Porter, Superintendent of Public Instruction, as parties defendant, have stipulated with the parties and to this court that they will advise the legislature of the State of Michigan as to the financial condition of the School Board of Kalamazoo and will submit to this court a report within sixty days indicating what State of Michigan action, if any, has been accomplished to assist in meeting the funding problems of the Kalamazoo School District.

In addition, defendant State Board of Education and Dr. John W. Porter, Superintendent of Public Instruction, will obtain and submit to the court within a sixty-day period an opinion from the Attorney General of the State of Michigan as to the application of his opinion No. 4673 and the restrictions on borrowing therein, to the School Board of Kalamazoo, in view of the orders and injunctions granted in this case.

Likewise, the defendant Kalamazoo School Board has voluntarily agreed to report to this court within sixty days on the status of all efforts to obtain additional revenues for the purpose of funding the remainder of the school year.

In addition, the Chamber of Commerce of the City of Kalamazoo and

others have urged the school board to conduct a new millage election. On Monday night, October 4, 1971, the school board unanimously voted to conduct a new millage election on Monday, November 22, 1971.

The efforts of the State Board of Education and the local school board are directed to obtain the necessary legislative authorization to make funds, if any are voted at the millage election, available for use in the current school year.

On Tuesday and Wednesday, November 23 and 24, 1971, this court will conduct hearings to review the then present status of the Kalamazoo school board's funding problems and re-evaluate funding alternatives then available to the Kalamazoo school system for the remainder of the school year, devoting special attention to the effect of application of the 180-day attendance rule established by the State Board of Education.

The findings of fact and conclusions of law contained in this opinion are obedient to the provisions of Rule 52(a) of the Federal Rules of Civil Procedure. Likewise, the preliminary injunctive provisions herein entered are made pursuant to Rule 65(d) of the Federal Rules of Civil Procedure.

The preliminary injunction of this court heretofore issued on August 20–25, 1971 is hereby amended to include the following additional injunctive provisions:

It is therefore ordered that the defendant Kalamazoo Board of Education cease and desist from the dismissal of any of the 103 teachers and counselors and the 35.5 school library assistants who received "pink slips" on September 20, 1971, and if any of these employees are presently off the payroll, the defendant Kalamazoo Board of Education is hereby ordered to re-employ them, until the further order of this court.

It is further ordered that the defendant Kalamazoo Board of Education, through its officers and agents, negotiate to agreement with the Kalamazoo City Education Association regarding terms of acceptance of the $100,000 gift donated to the Kalamazoo schools for the purpose of funding the salaries of 12 black teachers presently holding "pink slips," and that these named parties report to this court within ten days as to the progress of these negotiations.

It is further ordered that the defendant Kalamazoo Board of Education obtain whatever additional funds are required to presently employ the above-designated pink-slipped employees from funds presently budgeted for the maintenance of general public access to the Kalamazoo Public Library.

It is further ordered that on November 23, and 24, 1971, this court will conduct hearings for the purpose of reviewing the financial condition of the Kalamazoo School Board as of that date.

### ON MOTION FOR PROTECTIVE ORDER

Presently before the court in this school desegregation case is the plaintiffs' motion for a protective order which would regulate or bar defendants from taking the discovery depositions of two members of the School Board, Dr. Andrew Luff and Mr. Edward Thompson, who were members of the defendant Board on May 7, 1971, when the attendance zone plan presently in issue before this court was adopted.

This motion raises the issue of whether defense counsel, in light of their past representation of defendant Board, are likely to discover any facts relevant to this case by taking the testimony of the proposed deponents.

In considering the corollary question of whether the taking of the contested depositions would be likely to prompt needless annoyance, harassment and friction, the court is concerned with the further issues of whether the law firm of Ford, Kriekard, Staton and Allen, hereinafter referred to as "the Ford firm," should properly conduct these depositions, even if authorized, in view of the past and present attorney-client relationship.

With regard to the defendant's right to take the depositions of Dr. Luff and Mr. Thompson, the court is persuaded that in view of the central role played by these men in the Board action here contested and the likelihood of their appearance as witnesses in the ultimate trial of this cause, discovery depositions are appropriate.

However, the basic concern beneath plaintiffs' motion for protective order does appear to the court well founded in view of the current circumstances in this case. This legitimate concern springs not from the mere prospect of examination, but rather from the prospect of examination by the same attorneys who for over twenty years have acted as counsel and fiduciary to the Board and, necessarily, individuals acting in their official capacities as Board members, which members actually constitute the School Board. Board members are named as parties to this action, so that the reality of the personality of the living Board would be jurisdictionally before the court. In this sense defense counsels owe a duty to these named Board members.

During the entire period of their service on the Kalamazoo Board of Education, including the period during which the Board considered and adopted the May 7th plan of school desegregation, Dr. Luff and Mr. Thompson enjoyed an attorney-client relationship with the Ford firm with respect to the School Board's activities. The court must presume that confidences and opinions were shared between these Board members and the Board's counsel. That these individuals now resent counsel employing such confidences and such relationship in a detailed and, now, antagonistic manner is not surprising.

In due respect for the civility of the situation, such turnabout should have been avoided.

Counsel for the Board has urged that they have never represented the individuals, and they continue to urge that they do not represent the individuals; just the entity of the Board.

While this may be mechanically true and a mechanical interpretation of the law, the fact remains that the Board of Education cannot and does not exist in a vacuum. It can exist only through its living human being members acting in their official capacities, and in no other way. It just does not exist in thin air.

An attorney representing a school board should owe a duty of confidentiality to persons who are the only available conduit of information between the client corporate body entity and the attorney.

The long recognized fundamental principle of confidential attorney-client communications and relations can have no meaning absent recognition of the role of human interaction. The concept of an insensible artificial entity as the sole client, while useful and appropriate for many purposes, dehumanizes the attorney-client relationship and emasculates the attorney and client privilege if applied in this area blindly without flexibility.

The court is aware of the citations and the American Bar Association's Code of Ethics, ethical consideration 5–18 and 5–15 cited by defendants in their brief.

The defendants urge upon the court that there is no code in this area. The law is an axiological, not a mechanical science.

In an early case, In re Boone, 83 F. 944 (Circuit Court, N.D.California, No. 12,455, December 7, 1897), the Court stated:

"This general and well-settled rule is not found in any positive enactment. Indeed, none is necessary; it springs from the very nature and necessities of the relation of attorney and client, and finds its highest sanction in the confidential character of that relation." (At 953.)

As the Court long ago said in the Boone case:

"The relation of attorney and client is one of mutual trust, confidence, and good will." (At 953.)

Only human beings are capable of mutual trust, confidence and good will. An artificial body corporate has no such capability.

Given this relationship, tensions, which otherwise might well be avoided, can be expected when a client's entity's official spokesman and representative is confronted by the counselor-turned inquisitor.

In light of the circumstances of this case and the considerations set forth above, this court finds that, while disqualification of the Ford firm from further activities in this case is inadvisable, some supervision over the depositions of Dr. Luff and Mr. Thompson is called for.

The most advisable course is for other attorneys than members of the Ford firm to conduct the depositions. And I am sure there are able attorneys in the Kalamazoo area who can quickly adjust themselves to the fact situations sufficiently to conduct such depositions.

The court finds authority for this ruling in the administrative discretion conferred upon federal trial courts by Rules 1, 16, 30(c) and 83 of the Federal Rules of Civil Procedure.[1]

With regard to the manner of taking of depositions by such attorneys, the applicable discovery rules permit quite broad latitude. Rule 30(c) of the Federal Rules of Civil Procedure even permits the asking of questions which might be objectionable at trial, since the sole purpose is the re-evaluation of the relevant facts as well as irrelevant facts which may lead counsel to relevant facts for background purposes as distinguished from formal presentation to a trier of facts. Such flexibility in the form of questions does not appear prejudicial, since only a discovery deposition is involved. No jury will ever, even ultimately, enter into the picture on those questions which may be irrelevant. They will only be referred to in those areas which are actually relevant.

With regard to the ethical issue, the court finds that the Ford firm has violated no principle of the American Bar Association's Canons of Ethics, and because of the present posture of the case, they should remain and participate in the trial of the cause, conduct it.

---

1. See Wright & Miller, Federal Practice and Procedure, Civil § 1029.